**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-00336-WJM-SKC

CONNELL SOLERA LLC,

      Plaintiff,

  v.

LUBRIZOL ADVANCED MATERIALS,
INC., CHARLOTTE PIPE AND
FOUNDRY COMPANY,

      Defendants.

---

**CHARLOTTE PIPE AND FOUNDRY COMPANY'S
MOTION FOR DISCOVERY SANCTIONS AGAINST CONNELL SOLERA**

---

Pursuant to Federal Rule of Civil Procedure 37 and the Court's inherent power to manage discovery, Defendant Charlotte Pipe and Foundry Company respectfully requests that the Court issue two forms of discovery sanctions against Plaintiff Connell Solera LLC for intentional, bad-faith evidentiary spoliation. First, the Court should preclude Connell Solera's experts, Randy Kent and Kale Stephenson of Kent Engineering, LLC, from testifying at trial. Second, the Court should instruct any trial jury to infer that the spoliated evidence was unfavorable to Connell Solera.

## INTRODUCTION

This case turns on whether the Solera Apartment building's hot water and hydronic heating system (the "System") began to leak because the building's original construction team improperly installed the System, or because of defective CPVC pipes and fittings. Because Connell Solera dismantled and discarded the System without first allowing Charlotte Pipe to inspect it, the Court may never know the true answer. But the Court can be sure, based on Connell Solera's own communications, that Connell Solera planned to sue Charlotte Pipe before it tore out the System. It can also be sure that Connell Solera understood the value of allowing expert engineers to evaluate the System in its original state. Indeed, Connell Solera delayed repiping the System until its own expert could perform such an inspection to support this lawsuit.

Yet Connell Solera offered no such opportunity to Charlotte Pipe or Lubrizol Advanced Materials, Inc. Instead, despite anticipating its lawsuit against Charlotte Pipe, despite ASTM standards requiring future litigants like Connell Solera to notify interested parties before destroying relevant evidence, and against the recommendation of its own retained expert, Connell Solera refused to notify Charlotte Pipe about its claim or its plan to demolish the System. Instead, it proceeded to file suit and then waited months before finally serving Charlotte Pipe. By then, however, the System had been demolished, most of its components discarded, the building's walls were sealed back up, and only a hand-picked fraction of the System's components survived.

Connell Solera's bad-faith evidentiary spoliation has put Charlotte Pipe at a severe litigation disadvantage: it must establish that the System was improperly designed and installed without ever having seen or inspected it. The Court should remedy this prejudice by excluding Connell Solera's experts from trial and, if needed, through an adverse inference jury instruction.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Connell Solera owns the Solera Apartments building in Denver. In 2018, Greystar (the Solera's property management company) told several Connell Solera employees about leaks in the System. Ex. A, SOLERA_007104. Corey Crossfield, a vice president at the Connell Company ("Connell Co."),[1] informed her colleagues that the company would "need to repipe" the Solera at "major expense." Ex. C, SOLERA_007138. Then, in September 2019, Eric Geist, Greystar's director of construction services, reported that the System contained FlowGuard Gold CPVC pipe and fittings and added "there are currently no class action lawsuits on this product." Ex. D, SOLERA_008606. He said some law firms are "trying to build the case currently," but noted that it "may take many years to see the fruits of that labor." *Id.* Crossfield later summarized Geist's email to David Freidin, a senior vice president at Connell Co. Ex. E, SOLERA_008495.

Eventually, Geist met with an engineer from the AMA repiping firm to "go over the pipe replacement project." Ex. F, SOLERA_008035. After his inspection, the AMA engineer reported that: (1) "[n]one" of the building's construction plans are "true as builds" or contained a "stamp from engineers or architects"; (2) the "design of the system overall is off in the fact that the domestic Hot Water is not separated from the hydronic heating water"; and (3) the building's "boilers have been running way too high since the date of build . . . 24 hours a day." *Id.* Geist relayed to Crossfield the engineer's conclusion that the overheated boilers "likely caused the issues Solera has had" because consistent overheated water "is not suitable for the piping in place." *Id.*

Freidin then reported these findings to his boss and said that AMA's engineer found a

---

[1] Connell Solera is an LLC whose sole member is Connell Real Estate Holdings, LLC. Connell Real Estate Holdings's sole member is Connell Co. Ex. B, Freidin Dep. 8:2-18.

2

second "boiler system hook up that was never installed." Ex. G, SOLERA_006427. Freidin assumed that the building's developer and previous owner decided to "value engineer" the original plans, leaving the building with a combined system to serve both the building's residential hot water and hydronic heating systems. *Id.* Connell Solera decided that it could address the failures by either installing a second boiler hookup or repiping the CPVC pipes using copper pipes, which could withstand higher temperatures but would significantly increase the project's cost.

By September 2020, Connell Co. and Greystar decided to switch the System to copper and were looking for ways to recoup those costs, so Crossfield contacted an insurance consultant for advice. The consultant advised that the only way to recover the project's costs would be to file a "class action" or "individually sue the responsible party." Ex. H, SOLERA_006595.

Geist then informed Crossfield on October 6, 2020, that he received a "contact for the lawsuit against Flow Guard Gold with an engineer that specializes in this product failure for legal team of choice." Ex. I, SOLERA_006662. In a follow-up email, Geist continued:

> I talked to Randy and Patrick Kent from Kent Engineering this morning. They are the group that has been chasing down getting the class action lawsuit against Flow Guard [c]ertified. They can explain that process [in] more detail, until it is certified we would [be] able to get a larger amount back from this lawsuit based on what they are telling me. I think it is best to get them on the phone quickly to come to an agreement on scope of services as they need to see the system in place during the replacement project to help base the lawsuit on. Since we essentially started yesterday this either moves the project back a week maybe two or we get them involved and scheduled to be here in Denver early next week. If not the end of this week.

*Id*. at 006661.

Two days later, after speaking with Randy Kent, Crossfield told Geist that Kent "would like to get in . . . to do some testing on the system to preserve our ability to file a future suit . . . . [T]he point is we need to hold off on AMA starting the project for a few days so we do not hinder

3

that potential suit." Ex. J, SOLERA_008186. As Kent himself described in his deposition:

> Q: Now, when you were planning the visit to Denver to visit the Solera building, is it correct that you learned that the demolition and removal for the replacement piping system was already underway?
> A: I'm not exactly sure of the exact date, but it was very close to the date that I left to go down there.
> Q: And did you ask them to stop that so that you could conduct an inspection of the system?
> A: Yes.
> Q: Right, because it was important that you have the opportunity to inspect the system if there was going to be a lawsuit against Lubrizol and the FlowGuard Gold manufacturers; correct?
> A: Right.

Ex. K, Kent Dep. 171:18-172:6.

Later on October 6, Crossfield had a "call with legal discussing the piping at Solera." Ex. L, SOLERA_008892. Then, the Solera's community manager informed Crossfield, Geist, and Freidin that she told AMA to "hold off on cutting into the line or doing any further work until the additional engineer looks at the current system and he is aware. We have kept all pipes that were replaced from every CPVC pipe repair and can provide if needed." Ex. M, SOLERA_008890.

Randy Kent visited the Solera on October 13 and 14, 2020. Kent Dep. 57:19-24. During the visit, Kent and an assistant observed the boiler system, *id*. at 59:5-61:20, measured its then-existing temperatures, and extracted sections of unfailed System components for later testing, *id*. at 68:2-16. Kent also instructed Connell Solera that it needed to let Charlotte Pipe and Lubrizol inspect the System before tearing it out if Connell Solera intended to pursue a lawsuit. *Id.* at 178:21-180:3, 268:21-269:2. But Connell Solera kept mum. Freidin Dep. 98:23-99:2; 105:23-106:2, 114:6-25. Instead, it restarted the repiping project right after Kent's site visit. *Id.* 67:1-68:6.

Connell Solera filed suit in state court on November 11. *See* ECF No. 4 (Complaint). But rather than promptly serve Charlotte Pipe or Lubrizol, Connell Solera declined to serve them

4

before the standard service-of-process deadline, then moved *ex parte* to extend that deadline. *See* ECF No. 5 at 1. In its motion, Connell Solera recited that "defendants have not yet been served or appeared in this matter" and then represented that "[i]n the spirit of pursuing a just, speedy and inexpensive resolution," "Plaintiff is engaging with Defendants to try and resolve this matter prior to moving forward with expensive litigation." *Id.* at 2. But that representation, used to extend the service deadline to January 29, 2021, was false. *Id.* at 3 (order granting motion). No one from Connell Solera, Connell Co., or Greystar ever tried to contact or "engage with" Charlotte Pipe or Lubrizol about this suit or the ongoing demolition of the System before Charlotte Pipe was served on January 25. ECF No. 1-3 (proof of service); Freidin Dep. 43:22-44:11.

While delaying service and notice of the suit for months, Connell Co. and Greystar moved the repiping project toward completion. *See, e.g.*, Ex. N, SOLERA_007051 (November 25, 2020 email from Geist to Freidin and others reporting the repiping is "pretty much on track thus far in the process."); Ex. O, SOLERA_006995 (December 9, 2020 email from the Solera Manager email account saying AMA had completed the repiping work on just under half of the units in the building.). AMA finished the repiping project around February 4, 2021, shortly after Connell Solera finally served Charlotte Pipe. Ex. P, Connell's Resp. to Lubrizol's Interr. 18.

Charlotte Pipe retained counsel in early February 2021 and immediately contacted Connell Solera's counsel to arrange an *in situ* inspection of the System and any failed components. *See* Ex. Q, Feb. 5, 2021 Stewart-Gray Letter. Charlotte Pipe learned for the first time during those communications that Connell Solera had demolished the System, completed the repiping, reinstalled drywall, and destroyed or discarded the overwhelming majority of the original FlowGuard Gold CPVC pipe. *Id.*; *see also* Kent Dep. 185:20-187:10, 193:16-22. This denied

5

Charlotte Pipe and its experts any opportunity to inspect, measure, document, and analyze the System and its operation as it existed, and to use that opportunity to assess the root cause of failure in defending Connell Solera's claims.

**ARGUMENT**

The Court should address remedy Connell Solera's intentional, bad-faith spoliation in two ways. First, it should preclude Kent Engineering from testifying about the System or why failures occurred. Second, it should give an adverse inference instruction.

**I.      Legal Standards Governing Spoliation Sanctions**

Evidentiary spoliation is "the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Giblin v. Sliemers*, 147 F. Supp. 3d 1207, 1214 (D. Colo. 2015). Courts can punish spoliation under both Fed. R. Civ. P. 37, *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1149 (10th Cir. 2009), and their inherent discovery authority, *Giblin*, 147 F. Supp. 3d at 1214. Spoliation sanctions are "proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007).

District courts have "substantial weaponry in their arsenal to shape the appropriate relief" to remedy evidentiary spoliation. *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1225–26 (10th Cir. 2017). Depending on the spoliation's severity and the resulting prejudice, courts may "strike witnesses," "exclude evidence," or "issue an adverse inference" instruction. *Id.* at 1226. Deciding which sanction to impose is an exercise of the court's discretion, *Burlington*, 505 F.3d at 1032, and it should reflect an effort to balance the sanction against the prejudice that the moving party

6

suffers, *103 Invs. I, L.P. v. Square D Co.*, 470 F.3d 985, 989 (10th Cir. 2006). An order excluding an expert witness's testimony requires only that the moving party satisfy the *Burlington* test. *Square D Co.*, 470 F.3d 988-89. Adverse inference sanctions, on the other hand, require the moving party to also show that the spoliating party acted in bad faith. *Id.*

## II. The Court Should Preclude Connell Solera's Experts from Testifying at Trial

Connell Solera's conduct easily satisfies the *Burlington* test. Connell Solera's duty to preserve evidence arose once it decided in fall 2020 to sue Charlotte Pipe. It then breached that duty by simultaneously ensuring that its own experts could inspect the System and delaying any notice of the repiping project to Charlotte Pipe until after the System was torn out. That decision severely prejudiced Charlotte Pipe, preventing it from inspecting the System's original installation.

### A. Connell Solera's duty to preserve evidence arose as it planned to sue Charlotte Pipe by early October 2020

The duty to preserve relevant evidence arises when litigation is "imminent." *Burlington,* 505 F.3d at 1032. Courts in this District have interpreted that language to mean that the duty arises when "a party knows or should have known that the material may be relevant to future litigation." *Zbylski v. Douglas Cty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1163 (D. Colo. 2015) (internal quotes omitted); *Wolff v. United Airlines, Inc.*, 2019 WL 4450255, at *2 (D. Colo. Sept. 17, 2019) ("Ultimately, a party's duty to preserve arises when it has notice that the [evidence] might be relevant to a reasonably-defined future litigation.") (internal quotes omitted).

Connell Solera's own communications establish that, by early October 2020, it planned to sue Charlotte Pipe to recover the cost of repiping the System. In September 2019—over a year before this suit—Connell Co. had already directed Greystar to determine whether any class action lawsuits existed against the manufacturers of the System's pipe and fittings. SOLERA_008495.

7

Connell Solera admits that it was "contemplating" a lawsuit at that time. Freidin Dep. 66:23-67:3.

On September 28, 2020, Connell Co. had decided to repipe the Solera and began discussing options for recouping that cost. Its insurance consultant advised that a lawsuit would be the "only way" to recover. SOLERA_006595. By October 6, about a month before it sued Charlotte Pipe, Connell Solera began looking for someone to sue. It engaged Kent Engineering for its anticipated suit. Kent Dep. 188:6-19. It then paused the repiping project, SOLERA_008186, so Kent could personally "see the system in place during the replacement project *to help base the lawsuit on*." Ex. R, SOLERA_006661 (emphasis added). Kent's need to inspect the System to form opinions about the existing design and installation for use in the imminent lawsuit was so critical to Greystar and Connell Co. that they delayed the repiping so Kent could inspect the pipes before they were demolished and removed. *See id.* (Crossfield stating that Kent wanted to "do some testing on the system *to preserve our ability to file a future suit*. . . . [T]he point is we need to hold off on AMA starting the project for a few days *so we do not hinder that potential suit*.") (emphasis added).

Thus, when Connell Solera began the repiping project, it not only planned to sue Charlotte Pipe, but already understood that the System would be important evidence in that suit. *Gates Corp. v. CRP Indus., Inc.*, 2018 WL 4697327, at *11 (D. Colo. Aug. 10, 2018) (duty to preserve can be "triggered based on an internal investigation" that leads to future suit). Since Connell Solera knew that the System would be "relevant to" the impending suit, its duty to preserve the System arose before the repiping project began. *See Zbylski*, 154 F. Supp. 3d at 1163. And its experts now rely on information they gathered and components removed at the October 13-14 Solera site visit.

B. Connell Solera has spoliated critical physical evidence

Spoliation occurs when a litigant destroys, significantly alters, or fails to preserve its own

8

property for use as evidence after the duty to preserve has arisen. *Giblin*, 147 F. Supp. 3d at 1214. Connell Solera's destruction and alteration of the System, and its failure to preserve and methodically inventory its components, easily qualifies. *See* ASTM Std. E860-07, *infra*.

During the repiping project, Connell Solera kept only a few, hand-selected samples of original pipe and fittings. Some were chosen by plumbers who made repairs before Kent was retained. The Solera's manager held onto a few others that appeared to her to be "in the worst shape." Kent Dep. 192:2-18, Ex. 10 at SOLERA_009536; *see also* Ex. S, ESi Report at 8; Ex. T, Exponent Report at 49. These comprised only a tiny fraction of the many thousands of feet of pipe and hundreds of fittings that had been in service for roughly a decade before Connell Solera tore them out. *See* Kent Dep. 134:8-135:16 (estimating Solera contained "thousands of feet of pipe" and "several hundred" pipe fittings). Of course, these discarded components never failed and would have provided useful data and points of comparison.

Connell Solera, having discarded most of the evidence from the System, then failed to inventory the specimens it retained, and failed to accurately catalog the specimens' as-installed condition, location, or how they fit into the System. Kent. Dep. 186:19-23 ("[T]here was some, but not a lot of information [about] where [the pipes] came from"); Exponent Report at 12 ("Connell (and their consultants) did not sufficiently document the conditions existing prior to pipe replacement and the process of pipe extraction."). Most of the System's components were disposed of or destroyed during construction. *See* Kent Dep. 186:24-187:10, 193:16-22.

As described above, Connell Solera did all this without ever permitting Charlotte Pipe to see and inspect the System as originally installed. *See* Freidin Dep. 105:23-106:2, 112:4-14, 114:6-

9

25. Its failure to do so contravened the ASTM Standard entitled Examining And Preparing Items That Are Or May Become Involved in Criminal or Civil Litigation:

> If proposed tests, examinations, *or other actions* are likely to alter the nature, state, or condition of the evidence so as to preclude or limit additional examination or testing, the person, firm, or agency planning to perform the proposed action should . . . [r]ecommend that its client *notify other interested parties of the proposed action* described in [and] [r]ecommend to its client that *other interested parties be given the opportunity to participate in the procedures described in 5.2 or to witness and record any such actions*.

Ex. U, ASTM Std. E860-07 §§ 5.2, 5.2.1, 5.2.2 (emphasis added). Connell Solera's own experts concede that ASTM Standards are authoritative. *See* Ex. V, Kent Engineering Expert Report at 16, 17, 18 (citing ASTM Standards). And, when shown ASTM E860-07 during his deposition, Kent testified that he complied with it by instructing Connell Solera to notify Charlotte Pipe about the project before filing suit. Kent Dep. 264:13-269:2. Given its experts' reliance on the Standards, Connell Solera cannot claim that they did not govern its own conduct.

      C.      <u>Connell Solera's spoliation has severely prejudiced Charlotte Pipe</u>

Since Charlotte Pipe and its experts were never able to inspect and document the System, it is at a significant litigation disadvantage in assessing why it experienced allegedly "systemic" failures. In a similar case, the Tenth Circuit affirmed a district court's decision to strike an expert's testimony about the characteristics of spoliated physical evidence. In *Square D Co.,* the plaintiff's building caught fire and the plaintiff identified a defective busway as the cause. 470 F.3d at 987. The plaintiff sued the busway's manufacturer, but preserved only four feet of the original "fifty to sixty" foot busway. The surviving four feet shed no light on the case's key question: whether the busway displayed a warning label. *Id.* at 987-88. The defendant moved to strike the expert's testimony that the busway bore a warning label, arguing that it could not rebut the expert's opinion

10

without inspecting the original busway. *Id.* at 988. The court agreed, holding that the plaintiff spoliated the missing feet of busway, and excluded the plaintiff's expert's testimony at trial because "there was no substitute for a direct visual examination of the busway." *Id.* at 989.

The same is true here. This case will turn on whether the failures in the System were caused by product defects or by the System's admittedly "value engineered" design and "imperfect" installation. Kent Dep. 88:14-89:11 (describing the installation as "imperfect"); Ex. W, Stephenson Dep. 146:1-14 (same). Without having inspected the System before it was replaced, Charlotte Pipe has no way to directly rebut Connell Solera's experts' opinions that faulty design and installation did not cause the limited number of failures on which the claims rest. As in *Square D Co.*, there can be no substitute for an *in situ* examination of the System, the ability to document and measure the as-installed stresses and condition of the System's components, and the ability to methodically and comprehensively compare the large population of unfailed components with the relative handful of failed components selectively retained by Connell Solera and provided to Kent Engineering.

Connell Solera's pre-construction conduct and the experts' reports illustrate this prejudicial imbalance. As discussed above, ensuring that Kent Engineering could inspect the System was important enough for Connell Solera to pause the entire project so that Kent could do so. SOLERA_008186. The Solera's manager also kept "*all* pipes that were replaced from *every* CPVC pipe repair" and offered to "provide" them to Kent "if needed." SOLERA_008890 (emphasis added). But Kent unilaterally determined that unfailed pipes and fittings were not "evidence." Kent Dep. 265:15-266:17. Yet Kent Engineering acknowledged the value of its inspection to its eventual opinions. Kent Engineering Expert Report at 2 ("Our investigation included site visits to the

apartment building; documenting the system; collecting, identifying, and cataloging dozens of samples . . . ."), 4 (describing inspection during site visit); Kent Dep. 56:18-22 (stating that several opinions are based at least in part on his personal observations). Because Charlotte Pipe had no such opportunity, its experts were significantly disadvantaged:

> Connell's decision to extract the entire population of CPVC hot water piping from the building prior to putting Charlotte Pipe on notice hindered Exponent's ability to examine the in-situ conditions of the subject system. We were not able to document the hot water systems' pipe and plumbing components configuration prior to their extraction. We were not able to collect system operational data prior to the wholesale system modifications. We were not able to label and document pipe and plumbing components prior to extraction to allow accurate correlation of on-site geometry, orientation, constraint, and stress state to laboratory observations.

Exponent Expert Report at 12.

The record and applicable ASTM Standard establish that: (1) Connell Solera had a duty to preserve the physical evidence of the System and to allow Charlotte Pipe to inspect it; (2) that the System's condition should have been documented to all parties' satisfaction; and (3) that the System's components should have been methodically inventoried and preserved. Instead, Connell Solera demolished the System and retained only a handful of the worst looking failed components, all without notice to Charlotte Pipe and while slow-walking service of its pending lawsuit. Because Connell Solera's decisions violated the Rules and ASTM standards and caused severe prejudice, the court should strike their experts' testimony. *See Square D Co.,* 470 F.3d at 989.

### III. The Court Should Issue an Adverse Inference Jury Instruction

Because Connell Solera acted in bad faith, the Court should also instruct the jury to infer that the spoliated evidence showed that the System was improperly designed and installed. Courts can, when faced with bad-faith spoliation, both exclude certain testimony about spoliated evidence and issue an adverse inference instruction regarding that evidence. *EEOC v. Dillon Companies,*

12

*Inc.*, 839 F. Supp. 2d 1141, 1145 (D. Colo. 2011) (taking both actions and explaining that admitting the spoliating party's testimony would "negate the force of the adverse inference instruction"). In the Tenth Circuit, the "bad faith destruction of [evidence] relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1407 (10th Cir. 1997).

As discussed above, the physical evidence from and condition of the System is relevant to the case's key issue: whether the System was improperly designed and installed when the Solera was built, and whether that bootleg design and installation (coupled with constant operation at high temperatures) imposed excessive stresses on its pipe and fittings. And there is no question that Connell Solera destroyed or discarded almost every pipe and fitting that comprised that System. The only remaining question, therefore, is whether Connell Solera acted in bad faith.

While "[m]ere negligence in losing or destroying" evidence generally does not show bad faith, *Aramburu*, 112 F.3d at 1407, Connell Solera's conduct exceeds the kind of garden-variety negligence that courts usually forgive. In *Aramburu*, for instance, the court determined that a defendant was merely negligent when it misplaced a physical copy of the record at issue, but provided the substance of that record through other means. *Id.* at 1407. In *Turner*, the defendant employer lost an interviewee's job application records, but the court determined that it was merely negligent because its hiring manager tried in good faith to send the notes to the company's staffing office and the defendant produced "numerous" other documents relating to the plaintiff's application and interview process. 563 F.3d at 1149-50. And in *Dalcour v. City of Lakewood*, the court determined that the defendant was "at worst" negligent because a "computer error" likely caused the relevant records' disappearance. 492 Fed. App'x 924, 937 (10th Cir. 2012).

13

In contrast, Tenth Circuit courts have issued adverse inference instructions based on bad-faith conduct like Connell Solera's. In *Dillon Companies* the court found bad faith justifying an adverse inference when the defendant "recognized the need to maintain" evidence but allowed it to be destroyed in violation of governing policies. 839 F. Supp. 2d at 1145. And in *Philips Elecs. N. Am. Corp. v. BC Tech.*, the court issued an adverse inference instruction because the defendant's control over the lost evidence, the timing of its destruction, the number of destroyed records, and the "deliberate, calculated, and methodical behavior involved in the" destruction all pointed to bad-faith conduct. 773 F. Supp. 2d 1149, 1209 (D. Utah 2011).

As in *Dillon Companies*, Connell Solera no doubt understood its duty to preserve the evidence that it destroyed. It sought advice of counsel before the repiping project began, *see* SOLERA_008892 (discussing a call with "legal"), and made sure to preserve the System long enough for its own experts to see it. Yet Connell Solera destroyed the System without notifying Charlotte Pipe and inadequately preserved the few samples that it retained. ESi Expert Report at 8; Exponent Report at 12. Moreover, Connell Solera's failure to notify Charlotte Pipe before doing so was not merely negligent. Its own expert testified that, consistent with ASTM Standard E860-07, he instructed Connell Solera to warn Charlotte Pipe before proceeding with the project:

> Q: So it's your testimony, Mr. Kent, that you told Connell Solera that the manufacturers needed to be there if there was going to be a potential suit, and they disregarded that advice from you?
> A: Yeah, I am saying that I told them that they needed to not allow the repipe to go forward because you needed to be there[.]

Kent Dep. 178:21-180:3; *see also id*. at 168:11-169:7 (admitting that he has knowledge from previous engagements about how to contact both Lubrizol and Charlotte Pipe if necessary). But just as the defendant in *Dillon Companies* destroyed evidence that policies required it to retain,

14

Connell Solera went against that advice, and the ASTM Standards, by refusing to provide notice before proceeding with demolition of the System and its repiping project.

Equally egregiously, Connell Solera falsely stated to the state court that it was "engaging with" Charlotte Pipe in settlement discussions to obtain an extension of its service deadline to a date that allowed Connell Solera to all but complete the repiping project before Charlotte Pipe ever learned about it. *See* Freidin Dep. 43:22-44:11 (no knowledge of anyone from Connell Co. contacting Charlotte Pipe before extension motion); ECF No. 5 at 2 (January 13, 2021 order granting extension to January 29, 2021); ECF No. 1-3 (proof of service on January 25, 2021); Connell's Resp. to Lubrizol's Interr. 18 (repiping project concluded on February 4, 2021). Connell Solera had not, in fact, contacted Charlotte Pipe, even though both it and Lubrizol have websites that publish contact information and registered agents for service. This was tactical delay.

This type of "deliberate, calculated" behavior, *Philips Elecs.*, 773 F. Supp. 2d at 1209, and misuse of the judicial process show that Connell Solera acted in bad faith. In response, the Court should instruct the jury to infer that the spoliated evidence reflected that the System was improperly designed and installed such that it imposed excessive stress on Charlotte Pipe products that comprised it. *Xyngular v. Schenkel*, 890 F.3d 868, 873 (10th Cir. 2018) ("[A] court may exercise its inherent powers to sanction bad-faith conduct that abuses the judicial process[.]").

## CONCLUSION

For these reasons, the Court should strike the testimony of Connell Solera's experts Randy Kent and Dr. Kale Stephenson and give an adverse inference instruction to the jury.

Dated April 11, 2022	Respectfully submitted,

<div style="margin-left: 2em;">

*s/ Edward C. Stewart*
Edward C. Stewart
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone: 303.244.1800
Facsimile: 303.244.1879
stewart@wtotrial.com

Bradley R. Kutrow
McGuireWoods LLP
201 N. Tryon St., Suite 3000
Charlotte, NC 28201
Telephone: 704.343.2049
Facsimile: 704.343.2300
bkutrow@mcguirewoods.com

*Attorneys for Defendant
Charlotte Pipe and
Foundry Company*

</div>

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 11, 2022 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

• Edward Craig Stewart
stewart@wtotrial.com, powell@wtotrial.com, purdy@wtotrial.com

• Gregory Steve Hearing, II
ghearing@gordonrees.com, lbustos@grsm.com, lhubchikquelland@grsm.com, mvela@gordonrees.com

• James Lee Gray
lgray@hollandhart.com, IntakeTeam@HollandHart.com, mamcmillen@hollandhart.com

• Jeffrey Jason Lauderdale
jeffrey.lauderdale@lubrizol.com, lisa.williamson@lubrizol.com

• Shawn A. Eady
saeady@hollandhart.com, intaketeam@hollandhart.com, tldevlin@hollandhart.com

• Timothy William Gordon
tgordon@hollandhart.com, IntakeTeam@HollandHart.com, sncurtis@hollandhart.com

*/s/ Catherine Lacey*