**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 21-cv-00336-NYW-SKC

CONNELL SOLERA, LLC,

      Plaintiff,

v.

LUBRIZOL ADVANCED MATERIALS, INC., and
CHARLOTTE PIPE & FOUNDRY COMPANY,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Pending before the Court are five motions:

1. Defendant Lubrizol Advanced Materials, Inc.'s ("Defendant Lubrizol" or "Lubrizol") Motion for Summary Judgment ("Lubrizol Motion for Summary Judgment"). [Doc. 81, filed April 11, 2022].

2. Defendant Charlotte Pipe & Foundry Company's ("Defendant Charlotte Pipe" or "Charlotte Pipe") Motion for Summary Judgment ("Charlotte Pipe Motion for Summary Judgment"). [Doc. 82, filed April 11, 2022].

3. Defendant Charlotte Pipe's Motion to Exclude Testimony Under Federal Rule of Evidence 702 ("Motion to Exclude"). [Doc. 83, filed April 11, 2022].

4. Defendant Charlotte Pipe's Motion for Discovery Sanctions Against Connell Solera ("Motion for Sanctions"). [Doc. 84, filed April 11, 2022].

5.      Plaintiff Connell Solera, LLC's ("Plaintiff" or "Connell Solera") Motion for Reconsideration of Order Granting Lubrizol Early Summary Judgment on Eighth Claim of Relief ("Motion for Reconsideration"). [Doc. 115, filed June 10, 2022].

The issues raised in each motion have been fully briefed. On November 15, 2022, the Court entertained oral argument on each motion. [Docs. 135, 136]. The Court deemed the motions submitted and noted its intent to enter a written opinion expeditiously. For the reasons set forth below and as further detailed in this Memorandum Opinion and Order, the Court **GRANTS** Defendant Lubrizol's Motion for Summary Judgment; **GRANTS IN PART and DENIES IN PART** Defendant Charlotte Pipe's Motion for Summary Judgment; **GRANTS IN PART and DENIES IN PART** Defendant Charlotte Pipe's Motion to Exclude; **GRANTS IN PART and DENIES IN PART** Defendant Charlotte Pipe's Motion for Sanctions; and **DENIES** Plaintiff's Motion for Reconsideration.

## BACKGROUND[1]

### I.    Factual Background

The following facts are drawn from the record in this case and are undisputed for the purposes of summary judgment, unless otherwise noted.

Plaintiff is the owner of Solera Apartments, a building located at 1956 Lawrence Street in Denver, Colorado. [Doc. 81 at ¶ 1; Doc. 82 at ¶ 19; Doc. 95 at ¶ 1; Doc. 103 at ¶ 19]. The building was completed in 2010, though Plaintiff was not the original owner at the time of its construction or first occupancy. [Doc. 81 at ¶¶ 2–3; Doc. 95 at ¶¶ 2–3]. As such, Plaintiff played no role in

---

[1] The Court cites to the docket number and the page numbers assigned by the District of Colorado's Electronic Case Filing ("ECF") system for all documents, excepting citations to deposition testimony. Such citations will reference the page number and lines stamped on the original transcript for the sake of consistency.

selecting materials for the Solera Apartments, including materials used in the plumbing system. [Doc. 81 at ¶ 4; Doc. 95 at ¶ 4].

The original developer of the Solera Apartments subcontracted with Total Plumbing, Inc., to install the Solera building's hot-water plumbing system (the "System"). [Doc. 82 at ¶ 14; Doc. 103 at ¶ 14]. The System was comprised of pipes and fittings manufactured by Defendant Charlotte Pipe using compounds manufactured by Defendant Lubrizol (collectively, "Defendants"). *See, e.g.*, [Doc. 81 at ¶ 14; Doc. 82 at ¶ 1; Doc. 95 at ¶ 14; Doc. 103 at ¶ 1].

Approximately a year after the Solera Apartments received its certificate of occupancy, Plaintiff purchased the building. [Doc. 82 at ¶¶ 18–19; Doc. 103 at ¶¶ 18–19]. Before the purchase, Plaintiff had the ability to inspect the building pursuant to an Access and Indemnification Agreement. [Doc. 82 at ¶ 20; Doc. 103 at ¶ 20]. Plaintiff contracted with a third-party inspector to inspect the building, but requested an inspection of only "major components . . . but not the pipe within the walls." [Doc. 82 at ¶ 21; Doc. 103 at ¶ 21]. Plaintiff reviewed the report generated by the third-party inspector before eventually closing on the purchase of the building. [Doc. 82 at ¶ 22; Doc. 103 at ¶ 22]. Plaintiff "did not consider the design or components of the System to be important in its decision to purchase [the building], did not know that the System was comprised of CPVC components, and has conceded that such information 'would not have been significant or meaningful to [Plaintiff]' when it was considering purchasing" the building. [Doc. 82 at ¶ 23; Doc. 103 at ¶ 23].

Defendant Lubrizol is a chemical company that "manufactures advanced polymers for use in various applications." [Doc. 81 at ¶ 5; Doc. 95 at ¶ 5]. It owns the registered trademark FlowGuard®, which is registered for use with respect to chlorinated polyvinyl chloride ("CPVC") products. [Doc. 81 at ¶ 6; Doc. 95 at ¶ 6]. Defendant Lubrizol is responsible for manufacturing

"proprietary CPVC compounds that it sells to pipe manufacturers . . . for the manufacture of finished pipes and fittings." [Doc. 81 at ¶ 7; Doc. 95 at ¶ 7]. These products include different types of CPVC compounds that are marketed under different trade names and model numbers, including FlowGuard® 3107 and FlowGuard® Gold 88027, both of which are sold for use in plumbing applications and both of which have been on the market since 1992. [Doc. 81 at ¶¶ 10–11; Doc. 95 at ¶¶ 10–11].

FlowGuard® 3107 "is a granular powder that is used in the manufacture of pipes," while FlowGuard® Gold 88027 is a pellet that is used in the manufacture of fittings. [Doc. 81 at ¶¶ 16–17; Doc. 95 at ¶¶ 16–17]. As such, both compounds are essentially raw materials used in the manufacture of solid plumbing pipes and fittings suitable for installation in buildings. [Doc. 81 at ¶ 19; Doc. 95 at ¶ 19]. The compounds are "fed into an extruding machine," which in turn "extrudes out a length of pipe." [Doc. 81 at ¶ 23; Doc. 95 at ¶ 23]. The resulting pipes and fittings are governed by American Society for Testing & Materials ("ASTM") Standard D2846, which "establishes requirements for the Products' composition, dimensions, and physical properties, established by testing specified in the Standard." [Doc. 82 at ¶ 1; Doc. 103 at ¶ 1]. The ATSM Standards, in turn, provide uniform expectations that apply to all CPVC pipes and fittings. [Doc. 82 at ¶ 2; Doc. 103 at ¶ 2]. International and local plumbing codes accordingly approve the use of CPVC products that comply with the applicable ASTM standards. [*Id.*].

Defendant Charlotte Pipe manufactures, *inter alia*, pipes and fittings using Flow Guard Gold® CPVC compounds. [Doc. 82 at ¶ 4; Doc. 103 at ¶ 4]. The Flow Guard Gold® compounds are governed by ASTM Standard D1784, which specifies the compound's required contents.[2]

---

[2] Plaintiff has not produced evidence that the compounds manufactured by Defendant Lubrizol or the products manufactured by Defendant Charlotte Pipe did not comply with Standard D1784 or D2846, respectively.

[Doc. 82 at ¶ 5; Doc. 103 at ¶ 5].  It sells its FlowGuard Gold® products with an express Limited Warranty.  [Doc. 82 at ¶ 25; Doc. 103 at ¶ 25].  The warranty was in place "when the [Solera Apartments'] construction plan was submitted in December 2008, when the Solera [Apartments] received its Certificate of Occupancy in December 2010, and when [Plaintiff] purchased the Solera [Apartments] in October 2011."  [Doc. 82 at ¶ 27; Doc. 103 at ¶ 27].  The Limited Warranty

> (i) extends only to the "original owner of the structures in which the FlowGuard Gold® products were installed"; (ii) excludes all other express or implied warranties; (iii) requires claims arising from allegedly defective product to be made within 30 days "of discovery of such defect"; (iii) requires the allegedly defective product to be made available for "verification, inspection, and determination of cause"; (iv) bars warranty cla[i]ms "if the Products are not installed in good and workmanlike manner consistent with normal industry standards" or "in compliance with the latest instructions from Charlotte Pipe," i.e., the Technical Manual; (v) and bars claims if Products fail due to defects or "deficiencies in the design, engineering, or installation of the water system."

[Doc. 82 at ¶ 28; Doc. 103 at ¶ 28].[3]

In 2008, Defendant Lubrizol and Defendant Charlotte Pipe entered into a contractual arrangement evidenced by a Supply Agreement and Processor Agreement.  [Doc. 81 at ¶ 12; Doc. 95 at ¶ 12].  They still maintained that relationship in 2010.  [*Id.*].  Pursuant to the Supply Agreement, Defendant Lubrizol sold Defendant Charlotte Pipe both FlowGuard® 3107 and FlowGuard® Gold 88027 products for the purpose of "manufacturing pipe and fittings for hot and cold water, industrial, commercial, and acid waste applications."  [Doc. 81 at ¶ 13; Doc. 95 at ¶ 13].  Pursuant to the Processor Agreement, Defendant Lubrizol licensed the trademark FlowGuard® to Defendant Charlotte Pipe "for use with its construction products in exchange for

---

[3] The Court will refer to "Limited Warranties," plural, at times, in recognition of the fact that Defendant Charlotte Pipe published its limited warranty in two separate documents: a 2008 Charlotte Pipe FlowGuard® Gold Installation Technical Manual, [Doc. 82-24 at 25], and a 2010 Plastics Technical and Installation Manual, [Doc. 82-23 at 118].  The warranties are substantively identical for the purposes of resolving the pending motions.

[Defendant] Charlotte Pipe's agreement that it would buy its requirement of CPVC compounds exclusively from [Defendant] Lubrizol and maintain certain quality standards."  [Doc. 81 at ¶ 14; Doc. 95 at ¶ 14].

Defendant Lubrizol distributed its promotional literature, engineering manuals, and advertisements related to FlowGuard® products to Defendant Charlotte Pipe.[4]  [Doc. 95 at ¶ 41; Doc. 114 at ¶ 41].  Defendant Charlotte Pipe did not develop its own promotional literature.  [Doc. 95 at ¶ 42; Doc. 114 at ¶ 42].  Relevant here, Defendant Lubrizol's marketing materials noted that its FlowGuard® products were "ideal for both hot water recycling systems and hydronic heat applications," and were rated "for continuous pressure service of 100 psi at 180°F."  [Doc. 95 at ¶ 38; Doc. 114 at ¶ 38].  Plaintiff never reviewed any product literature or information published by Defendant Charlotte Pipe, and was unaware of the identity of the manufacturer or the pipes and fittings installed in the System until after failures had occurred.  [Doc. 82 at ¶ 24; Doc. 103 at ¶ 24].

Defendant "Lubrizol represented to purchasing plumbers that FlowGuard Gold® pipes and fittings, among other things, had a 50-year track record, were durable, had higher impact strength than other CPVC compounds, were supported by more experience regarding both lab testing and use in the field, had 50 years of proven performance, and that the FlowGuard Gold® compounds were the highest impact and heat resistant material of any CPVC compound."  [Doc. 95 at ¶ 44; Doc. 114 at ¶ 44].  In light of these representations, plumbing companies—including the company responsible for installing FlowGuard® products in the Solera Apartments—"understood that the

_____

[4] Defendant Charlotte Pipe disputes that it "ever used or redistributed to end-users any materials that [Defendant] Lubrizol created or distributed."  [Doc. 119 at ¶ 36].

product was easier to install, was durable and had high impact strength, and that the pipes and fittings had a long track record of successful use." [Doc. 95 at ¶ 45; Doc. 114 at ¶ 45].

On November 15, 2018, the first of several leaks in the System at the Solera Apartments was discovered. [Doc. 95 at ¶ 50; Doc. 114 at ¶ 50]. In September 2019, before retaining experts, Plaintiff elected to repipe the System by replacing all FlowGuard Gold® CPVC pipes and fittings with copper pipes and fittings. [Doc. 82 at ¶ 30; Doc. 103 at ¶ 30]. In October 2020, Plaintiff retained Randy Kent, P.E. ("Mr. Kent"), and Kale Stephenson, Ph.D., P.E. ("Dr. Stephenson") of Kent Engineering as expert witnesses; they performed "extensive failure analysis on the dozens of pipe and fitting products from the Solera Apartments, including laboratory testing, microscopy, and observations," [Doc. 95 at ¶ 48; Doc. 114 at ¶ 48], but did not analyze "whether repairing future failures individually would be a better strategy than repiping the entire System," [Doc. 82 at ¶ 31; Doc. 103 at ¶ 31]. Neither Kent Engineering nor Plaintiff notified Defendants of their inspection of the System, or offered Plaintiff a chance to participate. [Doc. 82 at ¶ 32; Doc. 103 at ¶ 32]. Kent Engineering's examination of the CPVC piping and fittings included "only 41 samples" from the System. [Doc. 82 at ¶ 33; Doc. 103 at ¶ 33]. Plaintiff learned of the identity of Defendants Lubrizol and Charlotte Pipe in October 2020, when it began considering legal action related to the failing plumbing system. [Doc. 95 at ¶ 51; Doc. 114 at ¶ 51].

## II.    Procedural Background

Connell Solera initiated this action on November 11, 2020 in the District Court for the City and County of Denver, Colorado. *See* [Doc. 4 at 1]. It raised claims against Defendant Lubrizol, Defendant Charlotte Pipe, and Cresline Plastic Pipe Co., Inc. [*Id.*]. Invoking this Court's diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332, Defendants removed this action to the United States District Court for the District of Colorado on February 3, 2021. *See* [Doc. 1]. On

February 3, 2021, the case was originally assigned to the Honorable William J. Martínez and drawn to Magistrate Judge S. Kato Crews.  [Doc. 6].[5]  On February 5, 2021, Plaintiff filed a notice of voluntary dismissal of this action against Cresline Plastic Pipe Co., Inc.  [Doc. 16].  Plaintiff filed an Amended Complaint on March 8, 2021, raising eight claims for relief, each against both Defendants Lubrizol Charlotte Pipe: (1) Negligence ("Count I"); (2) Strict Liability (Design Defect) ("Count II"); (3) Strict Liability (Manufacturing Defect) ("Count III"); (4) Strict Liability (Failure to Warn) ("Count IV"); (5) Breach of Express Warranty under Colo. Rev. Stat. §§ 4-2-313 and -318 ("Count V"); (6) Breach of Implied Warranty of Merchantability Under Colo. Rev. Stat. §§ 4-2-314 and -318 ("Count VI"); (7) Breach of Implied Warranty of Fitness for a Particular Purpose under Colo. Rev. Stat. §§ 4-2-314 and -318 ("Count VII"); and (8) Violation of the Colorado Consumer Protection Act ("CCPA") ("Count VIII").  [Doc. 27 at ¶¶ 53–138].

On April 28, 2021, Defendant Lubrizol filed a motion for early summary judgment, as contemplated by Judge Martínez's Civil Practice Standards.  [Doc. 36].  Judge Martínez subsequently granted summary judgment to Defendant Lubrizol on Plaintiff's seventh and eighth causes of action, i.e., breach of implied warranty of fitness for a particular purpose and violation of the CCPA, but denied the remainder of the motion.  *See generally* [Doc. 73].  Then, in its Response to Defendant Charlotte Pipe's Motion for Summary Judgment, Plaintiff withdrew both its implied warranty claims (that is, Counts VI and VII) as raised against Defendant Charlotte Pipe and its remaining implied warranty claim (Count VI) as raised against Defendant Lubrizol.  [Doc. 103 at 28].[6]  Thus, the only claims remaining are as follows:

_____

[5] On August 5, 2022, this action was reassigned to the undersigned upon her appointment as a United States District Judge.  [Doc. 125].

[6] In general, "[a] plaintiff who wishes to drop some claims but not others should do so by amending his complaint pursuant to Rule 15."  9 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2362 (3d ed.).  Thus, Plaintiff should have moved for leave to file a Second

(1)      Count I – Negligence against both Defendants;

(2)      Count II – Strict Liability (Design Defect) against both Defendants;

(3)      Count III – Strict Liability (Manufacturing Defect) against both Defendants;

(4)      Count IV – Strict Liability (Failure to Warn) against both Defendants;

(5)      Count V – Breach of Express Warranty under Colo. Rev. Stat. §§ 4-2-313 and -318 against both Defendants; and

(6)      Count VIII – Violation of the CCPA against Defendant Charlotte Pipe.

Following the completion of briefing on the five motions addressed in this Memorandum Opinion and Order, the Court entertained oral argument at a motions hearing held on November 15, 2022. *See* [Doc. 135]. The Court took each motion under advisement at the hearing, and now turns to their resolution.

## ANALYSIS

Because the outcome of the motions potentially impact the evidence in the record at summary judgment, the Court will first address Defendant Charlotte Pipe's Motion for Sanctions and Motion to Exclude. [Doc. 84; Doc. 83]. Then, the Court turns to the pending motions for

---

Amended Complaint omitting the implied warranty claims. Nevertheless, neither Defendant Charlotte Pipe nor Defendant Lubrizol appear to oppose dismissing both claims, *see* [Doc. 119 at 1; Doc. 114; Doc. 136], and this Court is mindful of Rule 1 of the Federal Rules of Civil Procedure. Thus, this Court **DISMISSES with prejudice** Counts VI and VII pursuant to Federal Rule of Civil Procedure 41(a)(2). *See, e.g.*, *Wilson v. Crouse-Hinds Co.*, 556 F.2d 870, 873 (8th Cir. 1977) (suggesting it is immaterial whether the court acts pursuant to Rule 15(a) or Rule 41(a)(2)). While dismissal under Rule 41(a)(2) is to be granted "without prejudice" "[*u*]*nless the order states otherwise*," this Court exercises its discretion to dismiss both counts with prejudice in the instant matter given that both counts were subject to the pending Motions for Summary Judgment. *See McLaughlin Grp., Inc. v. Vac-Trom Holdings, Inc.*, No. 20-cv-03531-PAB, 2021 WL 9569649, at *2 (D. Colo. Dec. 14, 2021) (dismissing claims pursuant to Rule 41(a)(2) because the court found that "dismissal with prejudice is proper").

summary judgment, [Docs. 81, 82], and concludes by addressing the Motion for Reconsideration. [Doc. 115].

I.      **Motion for Discovery Sanctions Against Connell Solera ("Motion for Sanctions")**

Charlotte Pipe seeks to preclude Kent Engineering from testifying, or requests an adverse inference, based on Connell Solera's replacement of the System without permitting an inspection. Specifically, Charlotte Pipe argues that Plaintiff was on notice of impending litigation by at least October 6, 2020, when Connell Solera was already planning on replacing the System with copper piping. [Doc. 84 at 3–4]. Mr. Kent requested that Plaintiff halt replacement of the System pending his inspection, which occurred on October 13 and 14, 2020. [*Id.* at 5]. Mr. Kent advised Plaintiff that Kent Engineering would need to preserve the System for inspection by Defendants' experts "if [the dispute] goes the legal route," because they "would need to be able to evaluate the [S]ystem." [Doc. 84-11 at 178:21–180:3]. Despite Mr. Kent's advice, Plaintiff began the removal and destruction of the existing System during the pendency of Plaintiff's state court case, originally filed on November 11, 2020. [Doc. 84 at 4–5]. The re-piping project was completed on February 4, 2021, at or around the time that Defendant Charlotte Pipe was served with process and retained counsel. [Doc. 84 at 5]. After contacting Plaintiff, Defendant Charlotte Pipe learned of the System's removal and destruction. [Doc. 84-11 at 185:20–187:10, 193:16–22].

Plaintiff does not dispute these core allegations: that the re-piping project was halted to permit an *in situ* examination by its own expert, Kent Engineering; that Kent Engineering advised it to permit Defendants' experts to examine the System before its destruction; that it continued with the re-piping project and completed it on February 4, 2021, without informing Defendants; and the no *in situ* inspection of the re-piped System was possible by the time Defendant Charlotte Pipe was aware of the lawsuit. *See* [Doc. 102 at 2–5]. Plaintiff stresses, however, that 41 samples

from the System—those that looked to be "in the worst shape"—were preserved and made available to Defendant Charlotte Pipe for inspection.  [*Id.* at 2; Doc. 84 at 10].  Plaintiff also contends that Defendant Charlotte Pipe was not prejudiced by the removal of the System prior to an *in situ* inspection, because it was able to inspect the cold-water system on site and take part in several destructive evidence examinations involving the preserved fittings.  [Doc. 102 at 2–3].  Nevertheless, Plaintiff still concedes that it "goofed" in removing the System while litigation was not only contemplated, but actively pending in state court.  *See* [Tr. at 40:6–13].[7]

As a remedy, Defendant Charlotte Pipe seeks to preclude testimony from Mr. Kent and Dr. Stephenson at trial.  [Doc. 84 at 1].  It also requests that the Court issue an adverse inference instruction to the jury, thereby directing them to presume that the spoliated evidence—that is, the removed System—was unfavorable to Plaintiff.  [*Id.*].

### A.   Legal Standard

The "[d]iscovery procedures set forth in the Federal Rules of Civil Procedure seek to further the interests of justice by minimizing surprise at trial and ensuring wide-ranging discovery of information."  *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 619 (D. Colo. 2007) (citation omitted).  To accomplish these objectives, Rule 26(b) permits broad discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1); *see also Williams v. Bd. of Cnty. Comm'rs*, 192 F.R.D. 698, 702 (D. Kan. 2000) ("[A] request for discovery should be considered relevant if there is 'any possibility' the information sought may be relevant to the subject matter of the action.").

---

[7] Citations to the transcript—marked "Tr."—refer to the rough transcript of the November 15, 2022 hearing that is available to the Court.  [Doc. 136].  This transcript is not certified.

To protect each party's ability to participate in the expansive discovery permitted by Rule 26(b)(1), "putative litigants have a duty to preserve documents that may be relevant to pending or imminent litigation." *Cache La Poudre Feeds*, 244 F.R.D. at 620. Where a party fails to do so, federal courts possess the inherent power and authority to fashion appropriate sanctions to remedy the consequences of the destroyed or otherwise unavailable evidence. *See, e.g.*, *Procter & Gamble Co. v. Haugen,* 179 F.R.D. 622, 631 (D. Utah 1998) (recognizing inherent authority under Federal Rule of Civil Procedure 37(b)(2) to sanction a litigant "who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information"), *aff'd in part and rev'd in part on other grounds,* 222 F.3d 1262 (10th Cir. 2000). As a general rule, the Court acts with discretion in imposing sanctions for abuse of discovery under Rule 37, *see Coletti v. Cudd Pressure Control*, 165 F.3d 767, 777 (10th Cir. 1999), although the Court also possesses "inherent power to impose sanctions for the destruction or loss of evidence." *Cache La Poudre Feeds*, 244 F.R.D. at 620 (citations omitted). The party seeking sanctions bears the burden of demonstrating that the requirements for imposing sanctions have been met, as well as the question of what sanctions should be imposed. *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1250–51 (10th Cir. 2010).

**B.    Discussion**

To begin, "[s]poliation sanctions are proper when '(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence.'" *Turner v. Public Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009) (citing *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007)).

### 1.    Spoliation

Spoliation results from "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Oto Software, Inc. v. Highwall Technologies, LLC*, No. 08-cv-01897-PAB-CBS, 2010 WL 3842434, at *7 (D. Colo. Aug. 7, 2010) (citing *West v. Goodyear Tire & Rubber, Co*., 167 F.3d 776, 779 (2d Cir. 1999)).   No later than September 6, 2019, Plaintiff believed that the product at issue, rather than installation errors or past repairs, were the cause of the issues with the System. *See* [Doc. 84-5 at 1].   No later than October 6, 2020, Plaintiff's own expert advised it of the importance of preserving the System if litigation was forthcoming.   *See* [Doc. 84-11 at 178:21–180:3].   Nevertheless, Plaintiff initiated suit in state court against Defendant Charlotte Pipe on November 11, 2020, and continued to demolish the System for nearly another three months *while it was actively litigating a case against Defendant Charlotte Pipe.  See* [Doc. 4 at 1].   There is no dispute that Plaintiff failed to preserve the System for an *in situ* inspection when litigation was not only reasonably foreseeable, but actually ongoing.   Counsel conceded as much during the November 15, 2022 hearing when he acknowledged that, had he known, he "definitely would have let defendants come in with their experts, and all I can do is apologize they didn't know at the time."  [Tr. at  40:25–41:4].   Thus, this Court concludes that Connell Solera spoliated the System as it existed *in situ*.

### 2.    Prejudice

Having determined that Defendant Charlotte Pipe has carried its burden with respect to the first prong of this test, the Court turns to the question of prejudice.   Defendant Charlotte Pipe argues that this entire case turns on the very System that was replaced by Plaintiff between October 2020 and February 2021, and thus, its inability to have an expert examine the System *in situ* makes

13

it impossible to gauge if or why the System suffered a "systemic" failure.  [Doc. 84 at 11–12].  Specifically, it asserts that "[t]his case will turn on whether the failures in the System were caused by product defects or by the System's admittedly 'value engineered' design and 'imperfect' installation."  [*Id.* at 12].  It further claims that the inability to conduct an *in situ* investigation makes it impossible to rebut the opinions of Plaintiff's experts from Kent Engineering.  [*Id.* at 12].  More fundamentally, Defendant Charlotte Pipe points to the unfair nature of permitting Plaintiff's expert to examine the System while precluding its own experts from doing the same.  [*Id.*].

Plaintiff contends that there is no prejudice because it has remedied the destruction by providing access to the samples from the System, which permitted its experts to issue a detailed report.  [Doc. 102 at 9].  Plaintiff also points to pre-removal photographs of the System and Defendant Charlotte Pipe's remaining ability to inspect the cold-water portion of the pipe system.  [*Id.* at 10].  Plaintiff claims that all this acts as a sufficient substitute for actually examining the System *in situ*.

As an initial matter, to the extent that Defendant Charlotte Pipe's defense relies upon rebutting any opinions that the products themselves were defective, it appears that such information about the composition, design, or manufacture of the pipes used and installed by Plaintiff should be within its own possession, custody or control and be unaffected by whether the System could be examined *in situ*.  Indeed, Defendant Charlotte Pipe does not argue otherwise.  *See* [Doc. 84; Doc. 117].  And its expert with respect to manufacturing, Steven B. MacLean, Ph.D., P.E. of Exponent, Inc. (collectively, "Exponent" or "Dr. MacLean"), points to no inability to draw his conclusions arising from the lack of an *in situ* inspection.  *See generally* [Doc. 84-20].

The Court similarly finds that Defendant Charlotte Pipe does not explain how other materials, such as building plans, plumbing specifications, and deposition testimony, could not

substitute, or at least mitigate significant prejudice, for inspecting the System *in situ* for its argument that the System failed due to "value engineered design." *See generally* [Doc. 84; Doc. Doc. 117]. In fact, Defendant Charlotte Pipe's expert, Exponent, Inc. through Bryan P. Templeton, Ph.D., P.E. (collectively, "Exponent" or "Dr. Templeton"), relied upon drawings, specifications, plans, and inspection reports from the building provided by Plaintiff for his opinions and understanding of the Solera Building System. *See, e.g.*, [Doc. 84-20 at 18, 19, 28–40]. Further, while Dr. Templeton indicates that the lack of an *in situ* inspection did not permit Exponent "to collect system operational data prior to the wholesale system modifications," [*id.* at 12], there is no explanation as to why such data are significant, given admissions from Plaintiff's own inspectors, plumbers, and engineers that the "design of the system overall is off in the fact that the domestic Hot Water is not separated from the hydronic heating water," and "our boilers have been running way to (sic) high since date of build . . . [t]he heating lines are circulating 165 degree water 24 hours a day." [*Id.* at 24]. Exponent further observed in its section regarding site observations that:

> In an unusual design choice, the potable water and hydronic water systems were combined. In this configuration, the hot water from the hot water tank in the boiler room is fed directly into the building, rather than through a mixing valve to decrease the temperature. This suggests that hot water was recirculating within the domestic hot water piping system between 150-165 °F rather than a more typical recirculation temperature of 120 °F for domestic hot water and 140 °F for hydronic water.

[Doc. 84-20 at 59].

But with respect to its other defense, i.e., the System failed due to "imperfect installation," *see* [Doc. 84 at 12], in particular at the site of the 15 failures, this Court finds that the lack of an *in situ* inspection does prejudice Charlotte Pipe, though not to the degree argued by Defendant

Charlotte Pipe.[8]  Kent Engineering opines that "CPVC piping systems at Solera were not exposed to environmental conditions beyond their specification limits."  [Doc. 84-22 at 3].  Exponent did participate in a site inspection on June 3, 2021 where it was able to "inspect[] and document[] select exposed locations within the domestic water plumbing system of the building" and correspond them to diagrams provided by Connell Solera, [Doc. 84-20 at 51]; and an inspection on August 17, 2021 where it revisited and documented the booster pump room on the third floor, the rooftop mechanical room, and the basement electrical room as well as specific units and locations "after 'windows' were cut into the drywall to allow direct visual access to domestic hot water risers, the hydronic water supply risers, the hydronic water return risers, and the domestic cold water risers."  [*Id.* at 54–55].  But Exponent specifically noted that the hot water supply and hydronic water return risers had already been replaced with copper piping at the time of Exponent's August 17, 2021 inspection.  [*Id.* at 55].  And Exponent explained that because the System was replaced without an *in situ* inspection, it could not determine how the original CPVC hot water fittings were installed, and "[t]his missing information is significant because Charlotte Pipe's technical manual specifies that CPVC tees or other CPVC components should not be used 'as hot and cold mixing devices.'"  [*Id.* at 66].  Plaintiff does not address how the representative samples which were removed from the building could demonstrate how the original CPVC hot water fittings were actually installed.  *See* [Doc. 102 at 9–10].  Nor does it adequately explain how pre-removal photographs could adequately substitute for a physical inspection of such fittings as installed.  [*Id.*].

---

[8] Even Dr. Templeton characterized the removal of the System prior to inspection as "hinder[ing]," but not precluding, Exponent's ability to examine the *in situ* conditions of the System.  [Doc.84-20 at 12].

### 3.    Appropriate sanctions

Sanctions for spoliation "serve to balance the prejudice caused by spoliation," meaning that "the severity of sanctions appropriately given is a function of the degree of fault of the culpable party and the degree of prejudice to the adverse party." *Hunter v. Big Rock Transp.*, No. 08-CV-116-J, 2009 WL 10698513, at *8 (D. Wyo. Feb. 25, 2009).  Indeed, the Tenth Circuit has recognized that discovery sanctions must be in the interests of justice and proportional to the specific violation of the Rules.  *See Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1557 (10th Cir. 1996) (discussing sanctions under Rules 16(f) and 37(b)(2) of the Federal Rules of Civil Procedure).  The United States Supreme Court has repeatedly cautioned that sanctions fashioned by federal courts premised on the court's inherent authority may not be punitive in nature.  *See, e.g.*, *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017); *Int'l Union, United Mine Workers of Am. V. Bagwell*, 512 U.S. 821, 826–30 (1994).  Instead, this Court is tasked with selecting "the least severe sanction appropriate to address the conduct" at issue.  *HT Holdings of Colo., LLC v. Karndean Int'l, LLC*, No. 17-cv-01926-MSK-KLM, 2018 WL 11220397, at *2 (D. Colo. Nov. 13, 2018) (citing *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 988–89 (10th Cir. 2006)).

With these principles in mind and based on the analysis of prejudice above, this Court concludes that entirely excluding Mr. Kent or Dr. Stephenson's testimony is unwarranted and that it is appropriate to focus any sanction upon curing the prejudice resulting from Defendant Charlotte Pipe's inability to examine how the original CPVC fittings were actually installed.  It appears that Kent Engineering's Report assumes that the pipes were installed with "acceptable levels of bending," [Doc. 84-22 at 23], and were installed consistent with Charlotte Pipe's technical manual that specifies that "CPVC tees or other CPVC components should not be used 'as hot and cold

mixing devices,'" [Doc. 84-20 at 66].   To the extent that Connell Solera intends to present testimony through Kent Engineering that its on-site inspection confirmed that the original CPVC hot water fittings were installed properly, they will be precluded from doing so.[9]   In addition, Defendant Charlotte Pipe will be permitted to explain that the System was replaced before it was able to inspect it *in situ* and Connell Solera will be precluded from cross-examining Exponent based on their lack of *in situ* inspection of the System prior to its replacement.   The Court need not make a finding of bad faith to impose this sanction short of an adverse inference instruction, because a defendant is "not required to show that [a] plaintiff acted in bad faith in destroying . . . evidence in order to prevail on its request for spoliation sanctions." *103 Investors I, L.P.*, 470 F.3d at 989.

For an adverse instruction, the general rule is bad faith is required.  *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997).  Here, Defendant Charlotte Pipe argues that Connell Solera engaged in bad faith, as evidenced by its destruction of the System after it knew of imminent litigation, after it stopped the replacement of the System for its own expert to examine it *in situ*, and after Mr. Kent told Plaintiff in October 2020 to maintain the System if it was going to "go the legal route." [Doc. 84 at 15–16; Doc. 84-11 at 178:21–180:3].  Charlotte Pipe also contends that counsel for Plaintiff misled the Colorado state court when it represented that it was engaging with Defendant Charlotte Pipe in settlement discussions to secure an extension of time to serve the summons and complaint that allowed Plaintiff to "all but complete the repiping project before Charlotte Pipe ever learned about it." [Doc. 84 at 16].  In Response, counsel explains that he was waiting for information from Connell Solera to formulate a better settlement demand, and sought

---

[9] If other admissible evidence demonstrates that the original CPVC hot water fittings were installed properly, this Order does not preclude such evidence to be introduced or Connell Solera from arguing such.

an extension to serve Defendant Charlotte Pipe to facilitate that demand in hopes of resolving this action without further litigation.  *See* [Doc. 102 at 14–15; Doc. 102-3 at 3–4].

The case was originally filed in the District Court for the City and County of Denver, Colorado on November 11, 2020.  *See* [Doc. 4].  Under the Colorado Rules of Civil Procedure, service was required within 63 days (nine weeks) after the complaint was filed, i.e., January 12, 2021.  *See* Colo. R. Civ. P. 4(e)(10).  The Colorado state court then permitted an extension from January 12 to January 29, 2021, and Plaintiff's counsel served Defendants on January 25, 2021.  [Doc. 102-3 at 3].  Plaintiff's counsel further represents that after service on January 25, 2021, "[o]ver the next few weeks," they had separate telephone calls with counsel for Defendants, including "Ed Stewart for Charlotte Pipe & Fittings, and Greg Hearing for Lubrizol Advanced Materials, about the facts of the case, Plaintiff's damages and the potential for settlement prior to Defendants filing their responsive pleadings."  [*Id.* at 3–4].  The case was removed to this Court on February 3, 2021, [Doc. 1]; and as of February 5, 2021, counsel for Charlotte Pipe acknowledged that "removal of the entire hot water plumbing system is completed, and the drywall covering the pipes has been reinstalled, but that the cold water system is still in place."  [Doc. 84-17 at 1].

The *Cache La Poudre Feeds* court defined bad faith as follows:

> Bad faith is the antithesis of good faith and has been defined in the cases to be when a thing is done dishonestly and not merely negligently. It is also defined as that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest.

*Cache La Poudre Feeds*, 244 F.R.D. at 635 (citation and internal quotation marks omitted). Although this Court finds Plaintiff's lack of coordination between Plaintiff's representatives and its counsel alarming, it does not conclude, based on the evidence in the record, that the replacement of the System was done dishonestly.  Accordingly, the Motion for Sanctions is **GRANTED IN**

**PART and DENIED IN PART**, and Connell Solera is **PRECLUDED** from (1) presenting testimony through Kent Engineering that its on-site inspection confirmed that the original CPVC hot water fittings were installed properly and (2) from cross-examining Exponent regarding a lack of *in situ* inspection of the System as it existed prior to the replacement of the System.

## II. Motion to Exclude Testimony Under Federal Rule of Evidence 702 ("Motion to Exclude")

### A. Legal Standard

Rule 702 of the Federal Rules of Evidence provides, in relevant part, that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As interpreted by the United States Supreme Court, Rule 702 requires that an expert's testimony be both reliable, in that the witness is qualified to testify regarding the subject, and relevant, in that the testimony will assist the trier in determining a fact in issue. *See Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589–92, (1993); *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004). The Supreme Court has described the Court's role in weighing expert opinions against these standards as that of a "gatekeeper." *See Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). To perform that function, a court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp*., 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592–93).

A court's gatekeeping function is not intended to prevent juries from assigning weight to otherwise admissible testimony, however. *See Ralston v. Smith & Nephew Richards, Inc.*, 275

F.3d 965, 970 (10th Cir. 2001). In other words, expert testimony challenged under Rule 702 may be admissible, but its impact may be limited by the weight a finder of fact chooses to assign it. *See Zuchowicz v. United States*, 140 F.3d 381, 387 (2d Cir. 1998) ("[D]isputes as to the strength of [the expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony."); *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008) ("[W]hether the facts used are qualitatively reliable is a question of the *weight* to be given the opinion by the factfinder, not the *admissibility* of the opinion."). With this legal standard in mind, the Court turns to Defendant Charlotte Pipe's arguments.

## B.   Discussion

Mr. Kent and Dr. Stephenson of Kent Engineering prepared two reports in the course of this matter: an Initial Report, [Doc. 83-1], and a Rebuttal Report, [Doc. 83-15]. As part of the Initial Report's Executive Summary, Kent Engineering discloses eight discrete "opinions." [Doc. 83-1 at 2–3]. These eight opinions form the basis of the instant Motion to Exclude, together with a ninth opinion that Defendant Charlotte Pipe argues was not disclosed in either report.

### 1.   Reliability

Defendant Charlotte Pipe first challenges the reliability of Kent Engineering's first, third, fourth, fifth, and eighth opinions. The Court assesses the reliability of each opinion in turn.

***Opinion 1 (Prejudgment).*** Kent Engineering's first opinion is that "CPVC piping and fittings in contact with hot water (verified to be 160 [degrees Fahrenheit] or lower) at Solera have embrittled and failed in an unreasonably short time." [Doc. 83-1 at 2]. Defendant Charlotte Pipe claims that the opinion is unreliable because Kent "formed it before inspecting the CPVC products at issue and before conducting any testing." [Doc. 83 at 4]. It bases this assertion on an

engagement letter executed by Mr. Patrick Kent, General Manager of Kent Engineering ("Mr. Patrick Kent"), on October 9, 2020.  [Doc. 83-7 at 1].  Defendant Charlotte Pipe claims that this letter, which references a proposal "to determine the cause of widespread embrittlement in CPVC water supply piping at the Solera complex," suggests that Kent Engineering had already formed a conclusion about the System's embrittlement and "then developed a hypothesis to fit that conclusion."  [Doc. 83 at 4–5].  It argues that developing a hypothesis to fit a conclusion leaves too great an analytical gap between an expert's methodology and his opinion.  [*Id.* (citing *Philmar Dairy, LLC v. Armstrong Farms*, No. 18-cv-0530 SMV/KRS, 2019 WL 3070588, at \*10 (D.N.M. July 12, 2019))].

The Court respectfully disagrees.  The engagement letter—the only evidence that Defendant Charlotte Pipe points to in arguing that Kent Engineering had already reached a conclusion regarding the embrittlement of the System—is just that: a letter outlining the scope of work that Kent Engineering would be responsible for performing.  Indeed, the letter is clear that Kent Engineering was "submitting the following proposal/protocol *to determine* the cause of widespread embrittlement."  [Doc. 83-7 at 1 (emphasis added)].  The letter then goes on to detail the steps that Kent Engineering will take in pursuit of that objective.  [*Id.* at 1–2].  This does not evidence prejudgment; rather, it outlines Kent Engineering's general responsibilities (albeit at a high level) and the specific steps it would take as part of its investigation.  To the extent that Defendants seek to cross-examine Mr. Kent or Dr. Stephenson as to whether either expert had reached a conclusion regarding the embrittlement of the System by the time the engagement letter was sent by Mr. Patrick Kent, they may do so.  *See Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1263 (N.D. Cal. 1997) (concluding that objections that the expert had prejudged the matter without

reviewing all of the relevant facts and deposition testimony went to weight, not admissibility).  As such, Kent Engineering's first opinion will not be excluded on these grounds.

***Opinions 1, 3, 4, 5, and 8 (Ipse Dixit Conclusions).***[10]  Kent Engineering's third opinion is that "[n]umerous Charlotte manufactured fittings had insufficient knit line fusion, also causing failures to occur."  [Doc. 83-1 at 2].  Its fourth opinion is that "[h]ot water CPVC fittings have degraded from normal and intended use, causing unexpected features to form on internal surfaces which also increase susceptibility to failure," [*id.*], and its fifth opinion is that "[c]hanges in molecular bonding have occurred in Solera CPVC pipe and fittings, which are a cause of observed degradation in mechanical properties," [*id.* at 3].  Finally, Kent Engineering's eighth opinion is that "CPVC piping systems at Solera were not exposed to environmental conditions beyond their specification limits."  [*Id.*].  Defendant Charlotte Pipe attacks all of these opinions on two primary grounds: first, that the opinions are based solely on *ipse dixit* suppositions, and second, that various tests performed in a laboratory on components from the System violated ASTM standards governing such tests and limiting their use.  [Doc. 83 at 5–8].

First, the Court respectfully disagrees that Opinions 1, 3, 4, 5, and 8 constitute *ipse dixit* conclusions.[11]  Precedent from the United States Court of Appeals for the Tenth Circuit "is clear and unequivocal that the *ipse dixit* of an expert, no matter how qualified he may be, is never enough to guarantee him a ticket to admissibility."  *Graves v. Mazda Motor Corp.*, 405 F. App'x 296, 300 (10th Cir. 2010).  If Kent Engineering's challenged opinions were truly conclusory, *ipse dixit* suppositions, the Court would be entitled to exclude them.  However, in this case Kent Engineering

---

[10] The Court also considers the admissibility of Kent Engineering's first opinion on the ground that it constitutes an *ipse dixit* conclusion.

[11] *Ipse dixit*—or "he himself said it"—refers to "[s]omething asserted but not proved."  *Ipse Dixit*, Black's Law Dictionary (10th ed. 2014).

has specifically outlined the basis for its opinion.  With respect to Opinion 1, Kent Engineering cited observation of brittle failures and low ductility when compared with new materials of the same manufacture.  [Doc. 83-1 at 2].  With respect to Opinion 3, Kent Engineering noted that "[k]nit line failures in fittings were a common failure mode" in the samples it analyzed, which indicated a lack of sufficient fusion during manufacture.  [*Id.*].  Kent Engineering rested Opinion 4 on the examination of fitting internal surfaces, which evidenced blisters and cracks.  [*Id.* at 3].  Opinion 5 was based on "[f]ourier transform infrared spectroscopy," which showed molecular changes consistent with literature "after prolonged outdoor exposure of CPVC and correlated with a loss of material ductility."  [*Id.*].  And Opinion 8 was based on water temperature and pressure data that Kent Engineering collected from Solera prior to the System's replacement, demonstrating that both were within Defendants Lubrizol's and Charlotte Pipe's specifications for the System.  [*Id.*].  These bases belie Defendant Charlotte Pipe's argument that Kent Engineering's opinions were nothing more than *ipse dixit*, because-I-said-so suppositions.  Rather, each opinion appears to be based upon examination of fittings from the System and laboratory tests used to analyze them, or upon examination of the System itself.

The second portion of Defendant Charlotte Pipe's argument is that Kent Engineering performed four primary tests—"the flattening test, the bend test, the tensile test, and the Izod test"—without regard to ASTM standards governing those tests and their use.  [Doc. 83 at 6].  It contends that "ASTM D2846 expressly disavows the application of the test methods" used by Kent Engineering on "specimens that have been returned from field service."  [*Id.* at 7].  Instead, it argues that ASTM D2846 can only be used to judge new products.  [*Id.*].  Plaintiff counters that Defendant Charlotte Pipe misapprehends the applicable standards, pointing to Note 13 of ASTM D2846 ABD, which clarifies that—because installation, use, and exposure can affect performance

over time—the requirements of ASTM D2846 "do not apply" to products that have been removed from prior installations, unless "agreed to by the manufacturer."  [Doc. 101 at 7].  This language is permissive rather than prohibitive, and the Court therefore agrees with Plaintiff that ASTM D2846 does not bar the testing of products that have been exposed to uncontrolled environmental conditions.  Rather, it provides that products removed from such conditions need not meet the standards in place for new products.  Defendant Charlotte Pipe is, of course, free to argue that the results of the laboratory tests performed by Kent Engineering are of limited probative value given that the tests were performed on products removed from uncontrolled environmental conditions (and because, as Note 13 to ASTM D2846 cautions, "conditions of installation, use, and environmental exposure can affect the performance of products over time").  [*Id.*].  And a jury may choose to assign those findings less weight as a result.  But disputes over the adequacy of Kent Engineering's laboratory tests speak to weight, not admissibility, and the Court respectfully declines to exclude testimony based on the reliability of Opinions 1, 3, 4, 5, and 8.[12]  *See e.g.,* *Crew Tile Distribution, Inc. v. Porcelanosa Los Angeles, Inc.*, No. 13-cv-3206-WJM-KMT, 2016 WL 8608447, at *6 (D. Colo. Sept. 12, 2016) (concluding that an expert's failure to apply ASTM standards went to the weight of her testimony, not its admissibility); *Tr. Dep't of First Nat. Bank of Santa Fe, Colo. Branch v. Burton Corp.*, No. 11-cv-01629-REB-CBS, 2012 WL 2884773, at *5 (D. Colo. July 13, 2012) (same).

   ***Opinions 2, 6, and 7 (Relevance)***. Defendant Charlotte Pipe next challenges the second, sixth, and seventh opinions offered by Kent Engineering as irrelevant.  [Doc. 83 at 9].  At the November 15, 2022 hearing, however, the Parties represented that challenges to the relevance of

---

[12] Nevertheless, Kent Engineering's eighth opinion is limited by the Court's ruling on the Motion for Sanctions.  *See supra.*

the second and seventh opinions had been withdrawn. [Tr. at 20:4–7]. As such, the only remaining opinion challenged for its relevance is Kent Engineering's sixth opinion—that "[l]oss of volatile compounds from the Solera CPVC pipe and fittings during use has caused product degradation and contributed to product failures." [Doc. 83-1 at 3]. Defendant Charlotte Pipe focuses its criticisms less on that conclusion, and more on Kent Engineering's concession that "[m]ore information, including a specific list and amount of Lubrizol's ingredients for its FlowGuard Gold® resin compounds is needed to better evaluate this issue." [*Id.*]; *see* [Doc. 83 at 9]. As an initial matter, it is worth clarifying that this argument appears to speak to reliability rather than relevance; indeed, possible causes for the System's degradation appear quite relevant to this matter. But in any event, the fact that Kent Engineering has expressed a need for more information to "*better* evaluate this issue" does not render the opinion *per se* unreliable. Rather, the Court finds that this language will likely assist a jury in weighing the value of Kent Engineering's sixth opinion, and does not warrant exclusion.

   ***Disclosure of "Impact Stress/Vibration" Opinion***. Finally, Defendant Charlotte Pipe argues that Mr. Kent testified to certain "impact stresses" that caused "vibrations" in the System at his deposition, but that he never disclosed those opinions in his expert report. [Doc. 83 at 10]. Defendant Charlotte Pipe argues that "the theory that 'impact stresses' caused the System to fail is merely an *ad hoc* 'off the top of my head' opinion," and that it is "precisely what Rule 26 outlaws." [*Id.* at 11]. First, it is unclear why an apparent dispute over the timeliness of disclosures under Rule 26 of the Federal Rules of Civil Procedure is shoehorned into a motion raised pursuant to Rule 702 of the Federal Rules of Evidence. But even taking the argument at face value, Plaintiff is correct that Defendant Charlotte Pipe has had "ample time to prepare its own experts to respond to this area of testimony at trial," and that it has already been presented with the opportunity to

cross-examine Mr. Kent regarding his "impact stress" and "vibration" opinions at his deposition. [Doc. 101 at 10]. And indeed, Defendant Charlotte Pipe concedes that Mr. Kent *did* reference vibrations in his rebuttal report. [Doc. 83 at 10–11; Doc. 83-15 at 7]. As such, the Court concludes that there is no basis for excluding Mr. Kent's opinions with respect to "impact stress" or "vibrations" under either Rule 702 of the Federal Rules of Evidence or Rule 26 of the Federal Rules of Civil Procedure.

For these reasons, Defendants' Motion to Exclude is **DENIED**, but this Court notes that Kent Engineering's testimony on all of its opinions is subject to its ruling on the Motion for Sanctions as set forth above.

## III.    Motions for Summary Judgment

### A.    Legal Standard

The Court may grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Put differently, the Court's function at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Of course, the bar on weighing evidence does not absolve a nonmoving party from the need to offer some "concrete evidence from which a reasonable juror could return a verdict" in his or her favor. *Anderson*, 477 U.S. at 256. Such a showing must consist of more than a "scintilla of evidence." *Id.* at 252. That is, conclusory statements based on speculation, conjecture, or subjective belief are insufficient to survive summary judgment. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

Whether a fact is "material" depends on whether it pertains to an element of a claim or a defense; a dispute is "genuine" if the evidence is so contradictory that a reasonable jury could return a verdict for either party.  *See Anderson*, 477 U.S. at 248.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  In reviewing a motion for summary judgment, this Court views all evidence in the light most favorable to the non-moving party.  *See, e.g., Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).  That said, the Court is not required to—and will not—make unreasonable inferences in favor of that party.  *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008).  It is this legal framework that will control the Court's consideration of Defendant Lubrizol and Defendant Charlotte Pipe's Motions for Summary Judgment.

### B.     Defendant Lubrizol's Motion for Summary Judgment

Defendant Lubrizol filed its Motion for Summary Judgment on April 11, 2022, [Doc. 81], following its filing of an Early Motion for Summary Judgment ("Early Motion") on April 28, 2021, [Doc. 36].  On February 3, 2022, Judge Martínez granted in part and denied in part the Early Motion; while Counts I through VI survived, Defendant Lubrizol was awarded summary judgment on Counts VII and VIII.  [Doc. 73].  Defendant Lubrizol now moves for summary judgment on Plaintiff's remaining claims.  [Doc. 81].  *Inter alia*, Defendant Lubrizol argues that it is entitled to summary judgment on the remaining counts because its products never reached Plaintiff in the form in which Defendant Lubrizol had sold them.  [*Id.* at 9–14].  Plaintiff responds by arguing that Defendant Lubrizol's compounds reached Plaintiff without substantial change.  [Doc. 95 at 16–20].  The Court considers this question dispositive, and resolves it in two steps: first, by considering

28

whether Defendant Lubrizol's compounds reach their user without substantial change in the condition in which it is sold and second, if not, whether Plaintiff has supplied record evidence that the compounds themselves were defective.

   **Substantial Change.**   Plaintiff's claims all arise under Colorado law.   *See generally* [Doc. 27 at ¶¶ 53–138].   In Colorado, it is settled that "[a] component-part manufacturer or raw-material supplier has no duty to foresee all the dangers that may result from the use of a final product which contains its component part or materials."   *Bond v. E.I. DuPont De Nemours and Co.*, 868 P.2d 1114, 1118 (Colo. 1993).   It is irrelevant whether the manufacturer of a component or raw material has knowledge of the design and use of the final product, *id.*, as such a standard "would encourage ignorance on the part of component part manufacturers or alternatively require them to retain an expert in the client's field of business to determine whether the client intends to develop a safe product," *Childress v. Gresen Mfg. Co.*, 888 F.2d 45, 49 (6th Cir. 1989) (internal quotation marks and citation omitted).   It follows that

> [a] manufacturer of component parts or supplier of raw materials can be held strictly liable based on a claim of design defect or failure to warn *only if* (1) the materials or component parts are in a defective condition or without a warning are unreasonably dangerous to the user or consumer; (2) the product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold; (3) the design defect or failure to warn is the cause of the plaintiff's injury; (4) the defendant sold the product and is in the business of selling such products; and (5) plaintiff sustained damages as a result.

*Bond*, 868 P.2d at 1118 (emphasis added) (citing *Union Supply Co. v. Pust*, 583 P.2d 276 (1978)). The second element of this test—that "the product is expected to and does reach the user or consumer *without substantial change in the condition in which it is sold*"—is most immediately relevant here.

   As noted *supra*, Defendant Lubrizol is in the business of making CPVC compounds.   Two such compounds are implicated in this case: FlowGuard® 3107 and FlowGuard® Gold 88027.

*See* [Doc. 81 at ¶¶ 16–17; Doc. 95 at ¶¶ 16–17].  It is undisputed that FlowGuard® 3107 "is a granular powder that is used in the manufacture of pipes," and that FlowGuard® Gold 88027 is a pellet used to manufacture fittings.  [*Id.*].  It is also undisputed that neither compound reached the Solera Apartments in granular or pellet form; instead, the compounds were "fed into an extruding machine," which in turn "extrude[d] out a length of pipe."  [Doc. 81 at ¶ 23; Doc. 95 at ¶ 23].

The determinative question is thus whether this transformation constitutes a "substantial change in condition" in which the FlowGuard® 3107 and FlowGuard® Gold 88027 are sold by Defendant Lubrizol.  Respectfully, the Court concludes that the answer is yes.  According to Plaintiff's own set of facts, the compounds produced by Defendant Lubrizol are the "sole *ingredient* making up end-use pipes and fittings."  [Doc. 95 at ¶ 19 (emphasis added)].  In characterizing the compounds as "ingredients," Plaintiff implicitly makes Defendant Lubrizol's own argument for it.  Like other ingredients, the FlowGuard® 3107 and FlowGuard® Gold 88027 compounds undergo a significant change before they reach their final form.  Not only are they heated and shaped into their end-use form, through intensive extrusion and/or injection molding,[13] [Doc. 36-2 at ¶¶ 11–13; Ex. 81-5 at 71:1–11], chemical composition changes as certain ingredients—such as processing aids and heat stabilizers—are consumed during the extrusion and molding process.  [Doc. 95 at ¶ 19].  The fact that Plaintiff disputes that this process constitutes a substantial alteration is of no moment, as is the fact that the pipes and fittings are made up of "100% of the *remaining* ingredients" of the FlowGuard® 3107 and FlowGuard® Gold 88027 compounds, [*id.* (emphasis added)].  Further, contrary to Plaintiff's allegation that "FlowGuard®

---

[13] "The basic principle of extrusion is familiar to anyone who has watched a Play–Doh press or pasta-making apparatus in action: a malleable material is forced through an aperture, which creates an outflow with a particular, uniform shape."  *M & G Polymers USA, LLC v. Carestream Health, Inc.*, C.A. No. 07C-11-242 PLA, 2010 WL 1611042, at *8 (Del. Super. Ct. Apr. 21, 2010), *aff'd sub nom. Carestream Health, Inc. v. M&G Polymers USA, LLC*, 9 A.3d 475 (Del. 2010).

Gold CPVC resin is the sole ingredient used to make FlowGuard® Gold pipes and fittings," [Doc. 27 at ¶ 8], Plaintiff's own expert opines that Lubrizol's products included additional ingredients: "**Opinion 7:** Charlotte FlowGuard Gold® is not pure CPVC. **Basis:** Nuclear magnetic resonance results had signals which indicate the presence of unknown materials in used and exemplar CPVC materials, indicating the use of filler materials that may have affected product performance and life." [Doc. 84-22 at 3]; *see* Fed. R. Civ. P. 56(c)(3) ("*Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record."). Those "remaining ingredients" are necessarily distinct from the full set of ingredients included in the compounds when sold by Defendant Lubrizol.

While the Colorado Supreme Court has emphasized "that the expected change in the parts must be substantial" and "small changes and minor processing will not relieve the component part manufacturer of liability," *Pust*, 583 P.2d at 283, altering the chemical composition of a compound and shaping it into an entirely new product is far from the type of minor change that courts discount when considering the liability of a component's manufacturer. *E.g.*, *Heinrich v. Master Craft Eng'g, Inc.*, 131 F. Supp. 3d 1137, 1152 (D. Colo. 2015) (placing sticker on major engine component not "substantial change"). In sum: the FlowGuard® 3107 and FlowGuard® Gold 88027 compounds were not expected to, and did not, reach Plaintiff without substantial change in the condition in which they were sold by Defendant Lubrizol.

**Pre-Existing Defect.** Nevertheless, "even substantial changes which do not affect a pre-existing design defect in parts do not absolve the manufacturer of liability." *Pust*, 583 P.2d at 283. But Plaintiff has not supplied record evidence to suggest a defect in the design of the FlowGuard® 3107 and FlowGuard® Gold 88027 compounds, meaning that no reasonable juror could conclude that Defendant Lubrizol could be liable for such pre-existing flaws.

As Defendant Lubrizol points out, the question of whether its compounds were defective is a question "that is beyond the ambit of common knowledge or experience of ordinary persons." [Doc. 81 at 16]. Such questions therefore require expert testimony to answer. *Park Rise Homeowners Ass'n, Inc. v. Res. Const. Co*., 155 P.3d 427, 430 (Colo. App. 2006) (noting that in Colorado, expert testimony is required to prove an issue "where the issue does not lie within the ambit of common knowledge of ordinary persons"). Plaintiff has attempted to do so by hiring Mr. Kent and Dr. Stephenson of Kent Engineering as expert witnesses. Yet, Plaintiff's expert reports do not address whether Defendant Lubrizol's compounds were defective and, instead, focus on the pipes and fittings themselves (which, as the Court has already noted, represent products that have undergone substantial changes since being molded out of Defendant Lubrizol's compounds). *See, e.g.*, [Doc. 81-8 at 13 (noting "large void" in fitting sample resulting from "insufficient material . . . added during injection molding manufacturing processes"), 24 (noting that "[m]icroscopic fracture surface observations from the[] failures indicate insufficient fusion at the knit line, a manufacturing defect sometimes caused by improper temperature control during injection molding"); Doc. 81-9 at 14 (noting that "defectively performing pipe['s]" failure to maintain shape suggested that it had been "formulated improperly")]. And indeed, Plaintiff's experts make no mention of ASTM 1748—that is, the standard governing CPVC compounds—or opine that either the FlowGuard® 3107 and FlowGuard® Gold 88027 compounds failed to comply with that standard. In contrast, they make abundant reference to ASTM D2846 (that is, the standard governing the CPVC pipes and fittings). *See, e.g.*, [Doc. 81-8 at 17 ("Mechanical testing was performed on sections of pipe using flattening test techniques per ASTM D2846 section 9.2 using 2" sections of pipe removed from ends of received samples."); Doc. 81-9 at 7 ("All hot water pipe was unable to withstand typical amounts of deformation that would be expected from ASTM

D2846 stamped CPVC piping . . ."), 8 ("These results indicate that pipe may also fail drop weight impact resistance tests, which are mentioned in Note 7 of ASTM D2846/D2846M.")].

At most, Plaintiff's experts speculate about the possibility of an underlying issue with the CPVC compounds in passing. *See* [Doc. 81-8 at 16 (reasoning that the cause of knit line cracks— a defect—"could either be the deficiencies in the original CPVC resin formulation or improper processing during manufacturing")]. But the Court is unpersuaded that this unsupported statement creates a triable issue of material fact, upon which a reasonable juror could find in favor of Plaintiff. First, Plaintiff's experts do not actually conclude that defects were present in the CPVC resins—only that such defects were a possibility. [Doc. 81-8 at 24 (concluding that "[o]ther defects such as blisters and randomly distributed cracks were also found on numerous fitting internal surfaces, which indicate material degradation due to deficiencies with the original material resin *and/or* manufacturing process" (emphasis added))].

Second, that assumption is not based on any testing of Defendant Lubrizol's compounds (whether against ASTM 1748 or any other standard). Instead, Plaintiff's experts tested a selection of pipes and fittings and—while comparing those pipes and fittings against ASTM D284, which governs pipes and fittings—mentioned that a defect in the "original CPVC resin formulation" could be a possible cause of eventual knit line cracks. [*Id.* at 16]. Indeed, without such testing, the Court is unable to determine whether their opinion is based on experience, personal knowledge, or some other source. Conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence, *see Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999); *Nutting v. RAM Southwest, Inc.*, 106 F. Supp. 2d 1121, 1123 (D. Colo. 2000), and the Court does not credit these statements as such here.

Third and finally, Plaintiff's experts expressly acknowledge that they lacked a specific list and amount of the ingredients used in Lubrizol's compounds. [Doc. 81-8 at 4]. They claim they require that information to "better evaluate" whether the loss of certain compounds from the CPVC pipes during their use caused product degradation. [*Id.*]. Without knowledge of the contents of Defendant Lubrizol's compounds, and with a specific notation that further information regarding the resin compounds was required to determine whether loss of compounds caused product failures, Plaintiff has simply presented insufficient evidence upon which a reasonable juror could conclude that a pre-existing defect in Defendant Lubrizol's compounds existed. For these reasons, summary judgment is warranted in Defendant Lubrizol's favor on Counts I through IV.

***Count V – Express Warranty***. The Court has concluded that Plaintiff has failed to adduce sufficient evidence to permit a reasonable juror to conclude that Defendant Lubrizol's products had not undergone substantial change prior to their installation. Plaintiff does not provide any case law, and the Court has found none, suggesting that the breach of an express warranty may be demonstrated when such a substantial change has occurred. Moreover, Defendant Lubrizol supplied only raw materials to Defendant Charlotte Pipe, and did not have any relationship with the building's original owner or Plaintiff upon the purchase of the pipes and fittings at issue. Moreover, Plaintiff has presented *no* evidence that it or the original owner of the building reviewed the marketing materials produced by Defendant Lubrizol. *E.g.* [Doc. 119-1 at 239:24–242:19]. Nor is this Court persuaded, with the lack of any authority identified by Plaintiff, that somehow an express warranty claim may be one by proxy, i.e., Defendant Lubrizol made representations through its marketing materials that the original building owner's contractor, Total Plumbing, may have seen that can be enforced by Connell Solera. *See* [Doc. 103-12]. Total Plumbing is not a party to this action, and any damage that it sustained from selecting FlowGuard® Gold CPVC

pipes cannot be recovered by Connell Solera. *Cf. Griffitts & Coder Custom Chopping, LLC v. CNH Indus. Am. LLC*, 438 F. Supp. 3d 1206, 1257 (D. Kan. 2020) ("Any claims arising from an injury to [a third party] from its use of the tractors belong to [the third party], and that entity has not asserted any claims here."). Accordingly, it follows that summary judgment is justified with respect to Plaintiff's claim as raised against Defendant Lubrizol with respect to Count V.[14]

### C.     Defendant Charlotte Pipe's Motion for Summary Judgment

The Court next turns to consideration of Defendant Charlotte Pipe's Motion for Summary Judgment.  [Doc. 82].  Defendant Charlotte Pipe advances four arguments: (1) that Colorado's economic loss rule bars Plaintiff's negligence and strict liability claims (Counts I through IV), or (2) in alternative, Plaintiff's negligence claim is subsumed by its strict liability claims; (3) that Plaintiff cannot succeed on its express warranty claim (Count V) because the Limited Warranties control, *see* [Doc. 82-17; Doc. 82-18], and, in any event, were not breached and such claim cannot

---

[14] In order to succeed on a claim for breach of an express warranty, a plaintiff must prove that (1) a warranty existed, (2) the defendant breached the warranty, (3) the breach proximately caused the losses claimed as damages, and (4) timely notice of the breach was given to defendant. *Carrado v. Daimler AG*, No. 17-cv-3080-WJM-SKC, 2018 WL 4565562, at *6 (D. Colo. Sept. 24, 2018). The fourth element of a successful breach of express warranty claim—the requirement for timely notice—serves three purposes: to (1) correct any defect; (2) prepare for negotiation and litigation; and (3) protect a party against stale claims that are asserted after it is too late for the seller to investigate them. *Palmer v. A.H. Robins Co., Inc*., 684 P.2d 187, 206 (Colo. 1984). "Compliance with the notice requirement is generally a condition precedent to recovery for a breach of warranty claim under the Uniform Commercial Code." *Id.* The "reasonable time" for notice of breach depends on the circumstances of each case. *Cooley v. Big Horn Harvestore Systems, Inc*., 813 P.2d 736, 740 (Colo. 1991). Defendant Lubrizol argues that it was *never* provided notice of the alleged breach of an express warranty prior to the filing of this lawsuit. [Doc. 81 at 20]. The record bears this much out. *See* [Doc. 81-2 at 114:11–15 ("Q[:] Other than service of the lawsuit and the ensuing communications associated with the lawsuit, are you aware of any pre-suit communications between Connell Solera and Lubrizol? A[:] I am not.")]. Plaintiff does not point to any evidence in the record suggesting that any such notice was provided. Nevertheless, given the lack of any underlying breach, this Court need not resolve whether there is a genuine issue of material fact as to whether Plaintiff's filing of the lawsuit was timely and reasonable under the circumstances. [Doc. 95 at 24].

be premised on Defendant Lubrizol's statements; and (4) that Plaintiff's CCPA claim (Count VIII) fails as a matter of law.  [Doc. 82 at 9–30].[15]  The Court considers each remaining argument in turn.

### 1.    The Economic Loss Rule (Counts I–IV)

Defendant Charlotte Pipe first argues that Counts I through IV—claims for negligence, strict liability for design defect, strict liability for manufacturing defect, and strict liability for failure to warn, respectively—warrant summary judgment under Colorado's economic loss rule because the duty allegedly breached was contained within a "network of interrelated contracts." [Doc. 82 at 9–14].  Plaintiff disagrees, arguing that the economic loss rule does not apply to it because it is not within contractual privity with Charlotte Pipe, and in any case, the economic loss rule does not prohibit tort claims that are based upon independent duties of care under tort law. [Doc. 103 at 14–15].  Defendant Charlotte Pipe construes Plaintiff's argument as an attempt to reallocate the risks of purchasing the Solera after-the-fact through the use of tort claims, rather than through any contract prior to executing the purchase.  [Doc. 119 at 5–6].

As an initial matter, it is undisputed that Defendant Charlotte Pipe and Plaintiff never entered into a direct contractual relationship.   [Doc. 82 at 10–11; Doc. 103 at 14–16].   As Defendant Charlotte Pipe notes, "[t]he policies underlying the application of the economic loss rule to commercial parties are unaffected by the absence of a one-to-one contract relationship," and "[c]ontractual duties arise just as surely from networks of interrelated contracts as from two-party agreements."  *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004).  Even if the Court assumes, for the purposes of this analysis alone, that the "network of interrelated contracts"

---

[15] Because of the dismissal of Counts VI and VII, *see supra* note 6, the Court omits discussion of Charlotte Pipe's argument that any implied warranty claims fail because the Limited Warranties disclaim implied warranties.

in this case—involving the Solera Apartments' original owner, the general contractor involved in constructing the Solera Apartments, the plumbing subcontractor hired to install pipes and fittings in the Solera Apartments, and Defendant Charlotte Pipe—encompasses Plaintiff following its purchase of the building, this Court still concludes that the economic loss rule does not bar Connell Solera's claims for negligence and strict liability.

The economic loss rule is broadly intended "to maintain a distinction between contract and tort law." *Town of Alma v. AZCO Const., Inc*., 10 P.3d 1256, 1262 (Colo. 2000). Colorado's economic loss rule was adopted out of concern for imposing both contract and tort liability for the same economic injury. *Id*. As such, Colorado's economic loss rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Id*. at 1264. Nevertheless, "certain common law claims that sound in tort and are expressly designed to remedy economic loss may exist independent of a breach of contract claim." *Id.* at 1263. The main inquiry for any economic loss rule defense is thus whether the tort claims "stem from a tort duty independent of the contract." *Van Rees v. Unleaded Software, Inc*., 373 P.3d 603, 605 (Colo. 2016). In such situations, the economic loss rule does not bar a plaintiff's tort claim. *Id.*

The Court's initial task is to determine whether the economic loss rule is implicated by Plaintiff's first four claims. Two conditions must be met. First, the duty must arise from a source other than the contract. Second, the duty must not also be a duty imposed by the contract. *Makoto USA, Inc. v. Russell*, 250 P.3d 625, 627 (Colo. App. 2009) (citing *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc*., 573 F.3d 947, 962 (10th Cir. 2009)). To determine the source of the duty, Colorado law asks (1) whether the relief sought in tort is the same as the contractual relief; (2)

whether the common law recognizes the tort duty at issue; and (3) whether there is any difference between the common-law and contractual duties. *BRW, Inc.*, 99 P.3d at 74.

The Court considers these factors in turn. First, the Court is tasked with analyzing whether the relief sought under Plaintiff's tort theories[16] is the same as the relief sought under its contractual theory arising from the Limited Warranties. In support of the application of the economic loss rule, Defendant Charlotte Pipe points to the prayer for relief in the Amended Complaint that is identical for all claims. [Doc. 82 at 12; Doc. 27 at 25–26]. The Court respectfully disagrees with Defendant Charlotte Pipe. While Plaintiff concedes that "the bulk" of its damages arising under its tort theories stem from "the economic damage related to the cost to replace Charlotte's defective Products in the hot-water portion of the plumbing system," it also argues that it "seeks relief related to property damage, including water damage to multiple units throughout the building and mold." [Doc. 103 at 16]; *see also* [Doc. 103-3 at 50:6–51:3; Doc. 27 at 26 (seeking "expenses incurred in the attempts by the Plaintiff to fix their plumbing systems, repair the floors and walls damaged by the failures of these systems, and the loss of use of and loss of rents for of any [sic] portions of the Solera Apartments")]. These damages are distinct from those damages recoverable under the Limited Warranties. [Doc. 82-17; Doc. 82-18 at 1 ("This warranty *excludes* any expense for removal or reinstallation of any defective product and *any other incidental, consequential, or punitive damages*." (emphasis added))]. Proceeding solely under the Limited Warranties, Plaintiff would be narrowly entitled to "replacement of, or credit for, [any] defective product." [*Id.*].

---

[16] In *Town of Alma*, the Colorado Supreme Court concluded that the economic loss rule serves to bar both negligence and strict liability claims where economic damage is caused by the breach of a duty voluntarily assumed in contract and that results from a failure of the purposes or expectancies under that contract. *Town of Alma*, 10 P.3d at 1261–62. The Court similarly considers Plaintiff's tort theories—those based on negligence and strict liability—together for the purposes of this analysis.

Proceeding simultaneously under a tort theory of liability permits the recovery of certain consequential damages that would be unavailable under the terms of the Limited Warranties. "Where a plaintiff's loss exceeds the limits of those expectancies, or is the result of a breach of duties arising independently of the contract, however, the [economic loss] rule does not apply." *United States Aviation Underwriters, Inc. v. Pilatus Business Aircraft, Ltd.*, 358 F. Supp. 2d 1021, at 1025 (D. Colo. 2005). Inasmuch as Plaintiff's claimed losses are distinct from those provided for by the contract, this factor weighs in its favor.

The same is true of the second factor, which requires Courts to inquire whether the common law recognizes the tort duties at issue. *See BRW, Inc.*, 99 P.3d at 74. Tort obligations exist at common law as independent duties "to protect all citizens from risk of physical harm to their persons or to their property . . . without regard to any agreement or contract." *Town of Alma*, 10 P.3d at 1262. These obligations include well-recognized duties of care for negligence, *see Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 73 (Colo. 1991), and for strict products liability, *Halliburton v. Pub. Serv. Co. of Colo.*, 804 P.2d 213, 216–17 (Colo. App. 1990). Plaintiff's claims here—for negligence, strict liability for design defect, strict liability for manufacturing defect, and strict liability for failure to warn—fit into these categories of existing duties at common law.

Finally, the Court concludes that there is a meaningful difference between the duties imposed by the Limited Warranties and those imposed by Plaintiff's tort theories. Namely, Plaintiff's claims are not solely limited to losses suffered because of damage to the System itself; instead, even allowing for substantial overlap, it points to damage to floors and walls (and also seeks relief for lost rent). [Doc. 103-3 at 50:6–51:3; Doc. 27 at 26]. This is precisely the sort of distinction that has led courts in this district to reject application of the economic loss rule. To

take one example, a set of purchasers of an underground heating system brought suit against a hose manufacturer raising, *inter alia*, claims sounding in contract, negligence, and strict products liability. *Loughridge v. Goodyear Tire and Rubber Co.*, 192 F. Supp. 2d 1175, 1183 (D. Colo. 2002). The defendants argued for application of the economic loss rule to bar the plaintiffs' tort claims, but the *Loughridge* court rejected that argument, at least in part, because theories of negligence and strict products liability imposed "a duty on the manufacturer of a product, outside any contractual duty, to act reasonably in the design, manufacture, and sale of the product." *Id.*

Taken together, each of these factors weighs against application of the economic loss rule. The source of Defendant Charlotte Pipe's duty arises from theories of negligence and strict products liability, which provide for different relief, are grounded in common law, and impose different duties than those imposed by the Limited Warranties.[17] Permitting Plaintiff's tort claims to proceed comports with the policy justifications for the economic loss rule, which seeks to prevent *duplicative* claims sounding in tort and contract. *See Town of Alma*, 10 P.3d at 1261–62. While there is admittedly overlap between the economic damages sought in Counts I through IV and Plaintiff's claims grounded in the Limited Warranties, they are not identical. As such, the Court finds that summary judgment is unwarranted in light of the economic loss rule.[18]

---

[17] The Court notes that, while it applies the Limited Warranties in determining whether the economic loss rule should bar redundant tort claims, there remains a question as to whether the Limited Warranties actually apply to Plaintiff. *See* [Docs. 82-17, 82-18 (noting that Limited Warranties applied "to the *original owner* of the structure" in which its products were installed)]. Because the Court has found in Plaintiff's favor, it need not resolve that question for the purposes of assessing the applicability of the economic loss rule. However, it bears noting that—if the Limited Warranties did not apply to Plaintiff—the economic loss rule would play no part in the Court's analysis of Counts I through IV, as there would be no question of duplicative recovery absent a binding contractual provision.

[18] Courts in this District—when denying application of the economic loss rule at summary judgment—permit claims to proceed to trial without limiting damages to only those amounts that

### 2.    Negligence Claim Subsumed by Strict Liability Claims (Count I)

However, the Court concludes that Defendant Charlotte Pipe prevails on its alternative argument—that Plaintiff's negligence claim is subsumed by its strict liability claims.  *See* [Doc. 82 at 14 n.4].  Plaintiff appears to concede this point, as it does not respond to this contention.  *See generally* [Doc. 103]; *KeyBank Nat'l Assoc. v. Williams*, No. 19-cv-03714-CMA-SKC, 2022 WL 684165, at *4 (D. Colo. Mar. 7, 2022).

Upon this Court's review, it appears that a split within this District exists on the question.  On the one hand, some courts have held "that Colorado law treats products liability claims as subsuming ordinary negligence claims premised on the same facts."  *Mills v. FCA US, LLC*, No. 18-cv-01891-MSK-STV, 2021 WL 4079363, at *11 (D. Colo. Sept. 7, 2021).  Others disagree, reasoning that negligence claims are not necessarily subsumed by strict liability claims even where they rest on similar factual bases.  *Shaffer v. FCA US LLC*, No. 1:20-cv-03167-CNS-MEH, 2022 WL 17268723, at *3 (D. Colo. Nov. 29, 2022).  Faced with this split in prior case law, the Court notes that the Colorado Supreme Court has reasoned that—at least in design defect cases—other claims may "*subsume*[] the issue of negligence."  *Walker v. Ford Motor Co.*, 406 P.3d 845, 852 (Colo. 2017) (emphasis added).

This Court is mindful of both lines of reasoning, but concludes that, for this action, the negligence claim would be subsumed as part of other strict liability claims because Plaintiff's claims here are premised on an identical set of facts and because Plaintiff has not forwarded any argument opposing it.  While Plaintiff raises the negligence claim in terms of "negligent" conduct, that conduct parallels its allegations raised in its strict liability claims.  *Compare* [Doc. 27 at ¶¶ 53–

---

would be recoverable apart from contractual damages.  *See, e.g.*, *Vyanet Operating Grp. v. Maurice*, No. 21-cv-02085-CMA-SKC, 2023 WL 1437897, at *9 (D. Colo. Feb. 1, 2023).

62 (negligence)] *with* [*id.* at ¶¶ 63–89 (strict liability)].   The Court respectfully agrees with the Colorado Supreme Court in reasoning that "regardless of whether a design-defect claim is based in strict liability or negligence, in order to properly return a verdict for the plaintiff, a fact-finder must determine that the product at issue is unreasonably dangerous." *Walker*, 406 P.3d at 852.   As such, any recovery under a negligence theory would necessarily duplicate recovery under a claim for strict products liability.   Accordingly, the Court finds that Plaintiff's negligence claim is subsumed by its strict liability claims, and **GRANTS** summary judgment in favor of Defendant Charlotte Pipe and against Connell Solera with respect to Count I.

### 3.      Express Warranty Claim (Count V)

Defendant Charlotte Pipe next argues that the Court should grant summary judgment in its favor on Count V, which is a claim for the breach of an express warranty.   [Doc. 27 ¶¶ 90–109]. Defendant Charlotte Pipe argues that the Limited Warranties control Plaintiff's claim, that it did not breach the Limited Warranties, and that, in any event, the Limited Warranties expressly preclude Plaintiff's request for "compensatory damages for repair and replacement of the . . . System."  [Doc. 82 at 14–22].   As explained below, the Court agrees that summary judgment is warranted with respect to Count V.

In general, the question of breach of an express warranty is one reserved for a trier of fact. *Graham Hydraulic Power, Inc. v. Stewart & Stevenson Power, Inc*., 797 P.2d 835, 837 (Colo. App. 1990).   That said, a Plaintiff must still supply record evidence sufficient to establish four elements in order to survive summary judgment: (1) that a warranty existed, (2) that the warranty was breached, (3) that the breach proximately caused the losses claims as damages, and (4) that the defendant received timely notice of the breach.  *Fiberglass Component Prod., Inc. v. Reichhold Chems., Inc*., 983 F. Supp. 948, 953 (D. Colo. 1997) (first citing Colo. Jury Instr.–Civil § 14:6

(1990 edition); and then *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187, 206 (Colo. 1984)).   It follows that, before determining whether any express warranty has been breached, the Court must first determine the scope and contours of any such warranty offered by Defendant Charlotte Pipe to its customers.

In its Amended Complaint, Plaintiff alleges—without pointing to specific documents or exhibits—that Defendant Charlotte Pipe has warranted in writing that, *inter alia*, its products were "well-suited as plumbing material with a useful life matching the lifetime of the structure[s]" in which they were used, and that it was "obligated to replace defective" products.   [Doc. 27 at ¶¶ 95–98].   Plaintiff also alleges that other express warranties were created through "sales brochures, catalogs, websites, and marketing materials," [*id.* at ¶ 99], and that the Limited Warranties fail their essential purposes and are unconscionable and unenforceable, [*id.* at ¶¶ 102, 105].   Defendant Charlotte Pipe takes the opposite view, arguing that the Limited Warranties are the *only* express warranties applicable to the System and that the marketing materials cannot form the basis of any express warranty claim.

***Limited Warranties.***   The Parties agree that Count V cannot be based on an alleged breach of the Limited Warranties, albeit for different reasons.   Charlotte Pipe argues that the "[t]here can be no dispute that only the FGG Limited Warranty applies in this action" and that it did not breach the Limited Warranty.   [Doc. 82 at 15–22].   Plaintiff argues that the Limited Warranties are inapplicable to it because they refer only "to the original owner of the structure" in which Defendant Charlotte Pipe's products were installed.   *See* [Doc. 103 at 21; Doc. 82-17; Doc. 82-18 at 1].   Either way, this Court finds that despite the language of the Amended Complaint, [Doc. 27 at ¶¶ 95–98], Count V is limited to a breach of express warranty premised upon representations

that Charlotte Pipe made, through Lubrizol marketing materials, prior to the sale of the products installed in the Solera Apartments in 2009 or 2010.  [Doc. 103 at 20].

Charlotte Pipe further argues that the Limited Warranty precludes any such express warranty claim.  [Doc. 82 at 22].  But this Court need not reach that argument, because as analyzed below, this Court concludes that Plaintiff cannot assert Count V against *Defendant Charlotte Pipe* based on *Lubrizol's* statements.

***Marketing Materials, Installation Manual, and Presentations.***   Originally, Defendant Charlotte Pipe argued that "there is no evidence that anyone from Connell Solera, or any other related party, ever saw any Charlotte Pipe brochure or website" prior to the purchase and installation of the System, as required by the Uniform Commercial Code.  [Doc. 82 at 17].  In opposing summary judgment as to its express warranty claim, Plaintiff clarified that it was relying upon representations made through Lubrizol marketing materials, prior to the sale of the products installed in the Solera Apartments, and specifically points to advertising materials, [Doc. 103 at ¶¶ 36–38; 20–25], and a "Design and Installation Manual for Water Distribution Systems," [*id.* at ¶ 39 (citing [Doc. 103-9])].  Plaintiff also contends that Defendant Lubrizol communicated with engineers and plumbing companies to create demand for its CPVC products, and made presentations to owners of plumbing and mechanical companies wherein advertising materials and manuals were distributed.  [*Id.* at ¶¶ 40–41].  Plaintiff points to five specific statements in the advertising brochure:

- references to a "long, successful track record";

- statements that "FlowGuard Gold® CPVC Pipes and fittings" offer an appropriate "alternative to copper pipe" and "performance" with a "nearly 50-year track record";

- statements that the products possessed a "higher impact strength than other CPVC compounds to withstand handling and installation demands";

- statements that the products were "[d]urable – greater impact strength than other CPVC compounds to withstand the demands of handling and installation"; and

- statements that the products were "[p]roven – no other non-metallic system has a longer track record in such diverse applications as hospitals, hotels, schools, high-rises, etc."

[Doc. 103 at ¶ 38 (citing [Doc. 103-7 at 2–3])].  Plaintiff points to four further statements contained in the Design and Installation Manual for Water Distribution Systems:

- claims "50 years of successful service history";

- assured the reliability of the FlowGuard Gold® plumbing system;

- states that the product was rated for continuous use at 180°F and 100psi; and

- states that "FlowGuard Gold® pipe and fittings are ideal for both hot water recycling systems and hydronic heat applications. ... FlowGuard Gold® pipe and fittings are rated for continuous pressure service of 100 psi at 180°F."

[*Id.* at ¶ 39 (citing [Doc. 103-9 at 4–5, 21])].  And with respect to presentations by marketing managers regarding FlowGuard Gold® products, Plaintiff claims they were directed to:

- tell customers of the benefits of using FlowGuard Gold® CPVC pipes and fittings, including life expectancy and ease of installation of the product;

- explain how the higher ductility of FlowGuard Gold® pipes and fittings benefitted installers during installation because it was easier to maneuver around obstacles; and

- provide end-users with copies of both marketing brochures and installation manuals, including those outlined above.

*See* [*id.* at ¶ 41 (citing [Doc. 103-10 at 43:1–44:9, 45:5–18, 47:22–48:10, 50:11–51:6])].

On Reply, Charlotte Pipe argues that it is not responsible for Lubrizol's statements and representations made in the marketing materials and presentation.  [Doc. 119 at 10–12].  This Court agrees that Connell Solera has failed to adduce sufficient evidence in the record to create a genuine issue of material fact that Defendant Charlotte Pipe was responsible for making such statements.

Sales brochures advertising the longevity and quality of a given product may constitute an express warranty under Colorado law. *See, e.g.*, *Loughridge*, 192 F. Supp. 2d at 1181–82 (construing promises by hose manufacturer regarding longevity as an express warranty of future performance); *Anderson v. Heron Eng'g Co., Inc.*, 604 P.2d 674, 676 (1979) (express warranty jury instruction required regarding a warranty that a chair lift was "safe," as stated in sales brochure). Consistent with such reasoning, Judge Martínez earlier denied Defendant *Lubrizol*'s motion for early summary judgment on Plaintiff's express warranty claims, reasoning that certain statements in the advertising materials—when viewed in the light most favorable to the nonmoving party—raised genuine issues of material fact "as to whether *Lubrizol*'s statements constitute an express warranty." *Connell Solera, LLC v. Lubrizol Advanced Materials, Inc.*, 584 F. Supp. 3d 980, 987 (D. Colo. 2022) (emphasis added).

The Court's present inquiry is whether *Defendant Charlotte Pipe* may be held liable for the breach of an express warranty allegedly contained in marketing materials created by Lubrizol. First, the Court notes that "express warranties *by the seller*" are created in three ways:

(a) Any affirmation of fact or promise made *by the seller to the buyer* which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Colo. Rev. Stat. § 4-2-313 (emphasis added). Relevant here is the Colorado Uniform Commercial Code's explicit reference to the buyer/seller relationship necessary to give rise to an express warranty. While Defendant Lubrizol was responsible for selling CPVC compounds to Defendant Charlotte Pipe, it is undisputed that Defendant Lubrizol never established a buyer/seller

relationship with the plumbing subcontractor at the Solera Apartments or with the building's original owner.  It is similarly undisputed that Plaintiff views Defendant Charlotte Pipe as the "seller."  *E.g.* [Doc. 103 at 3 (commenting on "numerous material representations" made by Defendant Charlotte Pipe while "*selling*" its products (emphasis added)), ¶ 57 ("In addition, Plaintiff's experts have also determined that there are manufacturing defects in at least seven of the FlowGuard Gold® fittings produced and *sold* by Charlotte . . ." (emphasis added))].  Recognizing this shortcoming, Plaintiff argues that Defendant Lubrizol's provision of marketing materials to Defendant Charlotte Pipe (and Defendant Charlotte Pipe's subsequent use of those materials) constitutes a sort of adoption of Defendant Lubrizol's representations.  [*Id.* at 20 ("Plaintiff bases its breach of express warranty claim on the representations that Charlotte made, *through the Lubrizol marketing materials*." (emphasis added))].  But the statutory text gives no hint of such a possibility, and—absent any guidance on the point from Colorado state courts—this Court is unwilling to read new provisions into state law.  Indeed, even assuming that this statutory definition is not dispositive (and that both Defendants Lubrizol and Charlotte Pipe may be simultaneous "sellers"), Plaintiff has not pointed to any authority showing that one entity may adopt an express warranty through the use of another entity's marketing materials.  The Court's independent research has similarly failed to uncover any such authority.

Second, Plaintiff simply fails to carry its evidentiary burden at summary judgment.  To be clear, the Court views all the evidence in the light most favorable to Plaintiff.  *See Simms v. Okla.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  At summary judgment, Defendant Charlotte Pipe is first tasked with showing the absence of a genuine issue of material fact.  *See Concrete Works, Inc. v. City & County of Denv*er, 36 F.3d 1513, 1517 (10th Cir. 1994).  Defendant Charlotte Pipe has done so here, pointing to deposition testimony from its own witnesses disavowing the statements made

in Defendant Lubrizol's materials and stating in unequivocal terms that neither the brochure nor the manual cited by Plaintiff were distributed to customers by Defendant Charlotte Pipe. [Doc. 119-1 at 239:24–242:19]. Indeed, it was clear that the marketing materials in the record would not have been used by Defendant Charlotte Pipe even in a hypothetical world, not least because they contained information about competitor's products. [*Id.* at 242:3–4 ("[W]e've never used this literature piece and never would.")].

As Defendant Charlotte Pipe has properly supported its Motion, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not proper. *Concrete Works*, 36 F.3d at 1518. Plaintiff has failed to do so. It has not cited *any* testimony or evidence casting doubt on Defendant Charlotte Pipe's disavowal of the marketing materials, or any evidence that Defendant Charlotte Pipe made similar representations to customers. The closest Plaintiff comes is to state that Defendant Lubrizol provides Defendant Charlotte Pipe with marketing materials, [Doc. 103 at ¶¶ 36–41], but not that any of the marketing materials *before the Court* were actually used by Charlotte Pipe. Instead, Plaintiff points to testimony that Defendant Charlotte Pipe used "only one" piece of marketing literature provided by Defendant Lubrizol, which is apparently not part of the record.[19] *See* [Doc. 119-1 at 240:4–242:19]. And while Plaintiff points to testimony by Mr. Richard Mondragon as evidence that marketing materials were supplied to customers, *see* [Doc. 103-10 at 43:1–44:9, 45:5–18, 47:22–48:10, 50:11–51:6], Mr. Mondragon is an employee of Defendant *Lubrizol*—not Defendant Charlotte Pipe.

---

[19] The "one" piece of marketing literature is not identified during the referenced deposition, nor does either Party identify it in its briefing.

Absent evidence that would create a genuine dispute of material fact, the Court cannot conclude that an express warranty existed between Defendant Charlotte Pipe and Plaintiff based upon Defendant Lubrizol's marketing materials, manuals, or presentations. Accordingly, this Court **GRANTS** summary judgment as to Count V in favor of Defendant Charlotte Pipe and against Plaintiff Connell Solera.

### 4.    Colorado Consumer Protection Act (Count VIII)

Plaintiff's final claim is raised under the Colorado Consumer Protection Act ("CCPA"). [Doc. 27 at ¶¶ 130–38].  Plaintiff argues that Defendant Charlotte Pipe, *inter alia*, engaged in deceptive trade practices by failing to disclose information about defective pipes and fittings prior to their sale to Plaintiff and other customers.  [*Id.* at ¶ 136].  Defendant Charlotte Pipe argues that summary judgment is appropriate, as it made no affirmative misrepresentations regarding the quality of its products to Plaintiff and because the condition of the System was immaterial to Plaintiff's decision to purchase the Solera Apartments.  [Doc. 119 at 14–15].

"The CCPA was enacted to regulate commercial activities and practices which, because of their nature, may prove injurious, offensive, or dangerous to the public." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003) (en banc) (internal citations and quotation marks omitted).  The CCPA accordingly "deters and punishes businesses which commit deceptive practices in their dealings with the public by providing prompt, economical, and readily available remedies against consumer fraud." *Id.*

To succeed on its CCPA claim, a plaintiff must show (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of the defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the

plaintiff's injury. *Hall v. Walter*, 969 P.2d 224, 234–35 (Colo. 1998).  With respect to the first element, to demonstrate the existence of a "deceptive trade practice, the plaintiff must show that a defendant 'knowingly ma[de] a false representation.'" *Rhino Linings USA, Inc.*, 62 P.3d at 147. Such "a false representation must either induce a party to act, refrain from acting, or have the capacity or tendency to attract consumers." *Id.*

The Court finds both of Defendant Charlotte Pipe's arguments persuasive.  First, as discussed with respect to Plaintiff's express warranty claim, Defendant Charlotte Pipe was not responsible for the representations made in Defendant *Lubrizol's* marketing materials.  And those materials—along with their marketing by "Lubrizol representatives"—are all that Plaintiff is able to point to as evidence of "false representations."  *See* [Doc. 103 at 26].  While Plaintiff makes the same conclusory allegation that Defendant Charlotte Pipe "relied" on Defendant Lubrizol's materials, and that it is therefore responsible for their contents, [*id.*], Plaintiff cites no authority to support the proposition.  More fundamentally, it points to no evidence in the record demonstrating that the allegedly false representations were ever shown to Defendant Charlotte Pipe's customers, or to Plaintiff in particular.  In fact, the record shows that Defendant Charlotte Pipe would "never" use certain materials supplied by Defendant Lubrizol.  [Doc. 119-1 at 239:24–242:19].

Even if that were not the case, Defendant Charlotte Pipe points to an equally compelling ground for summary judgment: that Plaintiff has already conceded the immateriality of the System in its decision to purchase the Solera Apartments.  Under the CCPA, "a false representation must either induce a party to act, refrain from acting, or have the capacity or tendency to attract consumers." *Rhino Linings USA, Inc.*, 62 P.3d at 147.  It logically follows that any representation that does *not* induce a party to act, refrain from acting, or to attract consumers cannot constitute an actionable deceptive trade practice under the CCPA.  Put differently, such representations must be

material.  *See Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1121–22 (10th Cir. 2008) (affirming grant of summary judgment where plaintiff failed to show that insurer's failure to inform insured of choice between repair and replacement was immaterial in decision to choose replacement).  Here, it is undisputed that the System was immaterial in Plaintiff's decision to purchase the Solera Apartments.  [Doc. 82 at ¶ 23 ("[Plaintiff] did not consider the design of components of the System to be important in its decision to purchase [the building], did not know that the System was comprised of CPVC components, and has conceded that such information would not have been significant or meaningful to [Plaintiff] when it was considering purchasing [the building]." (citation and internal quotation marks omitted)); Doc. 103 at ¶ 23].  It follows that any representations made in Defendant Lubrizol's marketing materials were immaterial to Plaintiff's decision to purchase the Solera Apartments, and do not show that Defendant Charlotte Pipe made those representations "with knowledge of [their] untruth, or recklessly and willfully made [them] without regard to [their] consequences, and with an intent to mislead and deceive the plaintiff."  *Rhino Linings USA, Inc.*, 62 P.3d at 147 (internal citations omitted).  For both these reasons, this Court **GRANTS** summary judgment in favor of Defendant Charlotte Pipe and against Plaintiff Connell Solera with respect to Plaintiff's CCPA claim.

### D.    Motion for Reconsideration

The final pending motion is a Motion for Reconsideration filed by Plaintiff.  [Doc. 115]. Plaintiff requests that this Court exercise its authority to reconsider interlocutory orders and deny summary judgment to Defendant Lubrizol on its CCPA claim in light of newly discovered evidence.  [Doc. 115 at 1–2].

Plaintiff's Motion for Reconsideration rests upon allegedly newly discovered evidence that was unavailable when Judge Martínez issued his Order granting in part and denying in part

Defendant Lubrizol's Early Motion for Partial Summary Judgment on February 3, 2022.  [Doc. 115; Doc. 73].  In his Order, Judge Martínez denied summary judgment to Defendant Lubrizol on the majority of Plaintiff's claims.  [Doc. 73 at 18].  Nevertheless, he granted summary judgment on Counts VII and VIII of the Amended Complaint, both of which arise under Colorado law.  [*Id.* at 4–5].  In particular, Count VII alleged breach of an implied warranty of fitness for a particular purpose pursuant to Colo. Rev. Stat. §§ 4-2-314 and -318, while Count VIII alleged a violation of the CCPA, codified at Colo. Rev. Stat. §§ 6-1-105(b), (c), (e), (g), and (u).  *See* [Doc. 27 at 121–38; Doc. 73 at 4–5].

Plaintiff does not challenge Judge Martínez's ruling with respect to Count VII, but argues that Count VIII should be reinstated because Defendant Lubrizol "knowingly made false representations about the CPVC pipes and fittings made from its resins and knowingly withheld material information regarding these products."  [Doc. 115 at 2].  Plaintiff specifically claims that the new evidence shows that: (1) Defendant "Lubrizol marketed the finished FlowGuard Gold® CPVC pipe and fittings directly to consumers," including the plumbers who installed the pipes and fittings in the Solera; (2) Defendant "Lubrizol's marketing included statements about the longevity and durability of the CPVC, the heightened ductility and impact resistance, ease of installation, and continuous use at 180°F"; (3) Defendant Lubrizol's marketing materials "did not mention . . . loss of ductility and impact modifiers when used . . . below 180°F," or the need for careful installation; (4) Defendant "Lubrizol knew that its statements were false and/or omitted material information"; and (5) "Plumbers relied on Lubrizol's representations in deciding to use FlowGuard Gold®" products.  [*Id.*].  Defendant Lubrizol counters by arguing that Plaintiff is essentially rehashing the same arguments that Judge Martínez rejected, pointing to its "experts' theory that finished pipes loss [sic] ductility under certain circumstances and therefore required precise

installation." [Doc. 121 at 2]. It also contends that Plaintiff's arguments related to marketing materials refer only to generalized statements rather than specific measurements or calibrations. [*Id.*]. Finally, Defendant Lubrizol claims that Plaintiff cannot establish "standing, causation, or public impact." [*Id.*].

The Federal Rules of Civil Procedure do not expressly provide for a motion for reconsideration. Because Plaintiff seeks reconsideration of a non-final order, his Motion "falls within a court's plenary power to revisit and amend interlocutory orders as justice requires." *United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, No. 06-cv-00037-PAB-CBS, 2010 WL 420046, at *3 (D. Colo. Feb. 1, 2010); *see also* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

Courts in this District have applied different standards on motions for reconsideration of non-final orders. *See United Fire & Cas. Co.*, 2010 WL 420046, at *3 (listing cases applying Rule 59(e) standard, Rule 60(b) standard, and "law of the case" standard). But as a general principle, courts may grant motions to reconsider where there is "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Nevertheless, a motion for reconsideration is not an avenue for a party to reargue issues by rehashing facts and arguments already addressed or available, yet neglected, in the original proceeding. *See id.* (citing *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991)). "The decision to grant reconsideration is committed to the sound discretion of the district court."

*F.T.C. v. Chapman*, 714 F.3d 1211, 1219 (10th Cir. 2013) (internal alterations, quotation, and citation omitted), and courts in this District generally "have imposed limits on their broad discretion to revisit interlocutory orders as justice requires," *Spring Creek Expl. & Prod. Co., LLC v. Hess Inv. II, LLC*, No. 14-cv-00134-PAB-KMT, 2015 WL 3542699, at *2 (D. Colo. June 5, 2015). And to that end, a motion for reconsideration is appropriate only "when the court has made a mistake not of reasoning but of apprehension" or "if there has been a significant change or development in the law or facts." *Rosenthal v. Dean Witter Reynolds, Inc*., 945 F. Supp. 1412, 1420 (D. Colo. 1996) (quotations and citations omitted).

Respectfully, the Court finds that reconsideration of Judge Martínez's Order is not warranted here. As an initial matter, Plaintiff does not argue that Judge Martínez committed any "mistake . . . of apprehension" in reaching his conclusion with respect to Count VIII, and is unaware of any "significant change or development in the law." *Id.*; *see generally* [Doc. 115]. Thus, the Court's inquiry focuses upon whether a significant change or development in the facts underlying Plaintiff's CCPA claim has occurred since Judge Martínez issued his ruling on February 3, 2022. *See Rosenthal*, 945 F. Supp. at 1420.

As noted above, Plaintiff must make a record showing of five elements to succeed on a CCPA claim: (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of the defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury. *Hall*, 969 P.2d at 234–35. The first element is most squarely disputed in this case. In order to establish a "deceptive trade practice, the plaintiff must show that a defendant 'knowingly makes a false representation.'"

*Rhino Linings USA, Inc.*, 62 P.3d at 147. Such "a false representation must either induce a party to act, refrain from acting, or have the capacity or tendency to attract consumers." *Id.*

Since the filing of Defendant Lubrizol's Motion for Early Summary Judgment, Plaintiff claims that discovery has demonstrated that Defendant Lubrizol made the sort of false or misleading statements that could subject the company to liability under the CCPA. [Doc. 115 at 2]. To make its point, Plaintiff attaches marketing materials from Defendant Lubrizol that make a variety of claims about the benefits of Defendant Lubrizol's products. *See* [*id.* (citing "statements about the longevity and durability of the CPVC, the heightened ductility and impact resistance, ease of installation, and continuous use at 180°F")]; *see also* [Doc. 115-2 at 2–3 (discussing, *inter alia*, "higher impact strength," a "[f]ast, easy installation process," and "superior durability")]. Yet, in order to be actionable, a challenged statement must still be subject to "specific measure or calibration." *Francis v. Mead Johnson & Co.*, No. 1:10-cv-00701-JLK, 2010 WL 5313540, at *5 (D. Colo. Dec. 17, 2010).

Plaintiff has not pointed to marketing materials that make use of such specific measures, but merely those that make Lubrizol products seem appealing to potential purchasers. The fact that Lubrizol referenced nearly "50 years of successful service history"—while a measure of time—does not speak to the durability or specific use of FlowGuard Gold® pipes. [Doc. 115 at ¶ 4]. Plaintiff also points to the use of certain comparative adjectives as the source of false and misleading statements—specifically "*higher* impact strength," "*greater* impact strength," and a "*longer* track record." [*Id.* at ¶ 3 (emphasis added)]. These terms appear in Defendant Lubrizol's public marketing materials, and are the sort of "mass advertising expressed in vague terms" that constitutes "mere puffery"—that is, "those vague generalities that no reasonable person would rely on as assertions of particular facts. *Alpine Bank v. Hubell*, 555 F.3d 1097, 1106–07 (10th Cir.

2009); *see also Giles v. Inflatable Store, Inc.*, No. 07-cv-00401-PAB-KLM, 2009 WL 961469, at *3 (D. Colo. Apr. 6, 2009) ("[T]he phrase 'best built'—at least in the present context—constitutes puffery as a matter of law.  It is not capable of specific measure or calibration.  Were another company to argue its equipment was 'best built,' one would be hard pressed to objectively determine which claim was correct.").  The same holds true for statements that "FlowGuard Gold® pipe and fittings are *ideal* for both hot water recycling systems and hydronic heat applications." [Doc. 115 at ¶ 4 (emphasis added)].

A closer question arises with respect to certain statements in Defendant Lubrizol's Manual for Water Distribution Systems, [Doc. 115-4], in which it assures purchasers that "FlowGuard Gold® pipe and fittings are rated for continuous pressure service of 100 psi at 180°F."  [*Id.* at 21]; *see also* [Doc. 115 at ¶ 4].  But even assuming that this constitutes the sort of specific, measurable statement that is cognizable under the CCPA, Plaintiff fails to demonstrate a key point: whether Defendant Lubrizol made the statements "either with knowledge of [their] untruth, or recklessly and willfully made [them] without regard to [their] consequences, and with an intent to mislead and deceive the plaintiff." *Parks v. Bucy*, 211 P. 638, 639 (1922).  Plaintiff makes the conclusory allegation that it has carried this burden here, citing to two portions of Ms. Michelle Knight's deposition.  [Doc. 115 at ¶ 7].  The first of these simply references the fact that Defendant Lubrizol expected the pipes made from its compounds to turn brown over time if used at elevated temperatures.  [Doc. 115-6 at 31:7–10 ("Q. Okay.  So does Lubrizol expect that . . . the pipe made from its CPVC compounds will turn brown over time if used at elevated temperatures?  A. Yes. That's a normal occurrence.")].  The second essentially confirms that elevated temperatures can accelerate the physical aging of a pipe made out of Defendant Lubrizol's CPVC compound.  *See* [*id.* at 164:3–166:14].  Neither of these statements actually demonstrates that pipes made using

Defendant Lubrizol's compounds were *not* rated for a continuous pressure service of 100 psi at 180°F.

In sum: Plaintiff's newly discovered evidence does not include false representations, and therefore cannot give rise to a deceptive trade practice. Plaintiff's motion for reconsideration is thus **DENIED**.

### CONCLUSION

For the foregoing reasons, it is **ORDERED** that:

1. Defendant Lubrizol's Motion for Summary Judgment, [Doc. 81], is **GRANTED**;

2. Defendant Charlotte Pipe's Motion for Summary Judgment, [Doc. 82], is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The Court **GRANTS** summary judgment in favor of Defendant Charlotte Pipe and against Plaintiff Connell Solera as to Counts I, V, and VIII;

   b. The Court **DENIES** summary judgment in Defendant Charlotte Pipe's favor on Counts II, III, and IV; and

   c. Counts VI and VII are **DISMISSED** with prejudice pursuant to Fed. R. Civ. P. 41(a)(2);

3. Defendant Charlotte Pipe's Motion to Exclude Testimony, [Doc. 83], is **GRANTED IN PART** and **DENIED IN PART** in light of Plaintiff's voluntary dismissal of the second and seventh expert opinions offered by Kent Engineering, LLC. All other challenged opinions shall not be excluded at this time;

4. Defendant Charlotte Pipe's Motion for Sanctions, [Doc. 84], is **GRANTED IN PART** and **DENIED IN PART**.  While Plaintiff committed spoliation, entirely excluding the testimony of Randy Kent and Kale Stephenson of Kent Engineering, LLC, would not be proportional to the prejudice suffered by Defendant Charlotte Pipe.  The Court therefore **GRANTS** the Motion insofar as it precludes Kent Engineering representatives from testifying that the System was installed correctly, or in regard to any observations made of the System *in situ.*  The Court **DENIES** the Motion insofar as Defendant Charlotte Pipe seeks to entirely exclude the testimony of Randy Kent and Kale Stephenson, or for the Court to issue an adverse jury instruction regarding the spoliated evidence;

5. Plaintiff's Motion for Reconsideration, [Doc. 115], is **DENIED**; and

6. The Trial Preparation Conference **REMAINS SET** for **April 7, 2023 at 2:00 p.m.**  No later than **March 7, 2023**, Plaintiff and Defendant Charlotte Pipe shall file a Joint Status Report, addressing whether an eight-day jury trial is still necessary given the Court's rulings herein.

DATED:  February 23, 2023            BY THE COURT:

_____
Nina Y. Wang
United States District Judge

58